STATE OF NEBRASKA, APPELLEE, v. LEROY J. PARMAR, APPELLANT.
437 N.W.2d 503

Filed March 31, 1989.   No. 88-505.

Thomas M. Kenney, Douglas County Public Defender, and Brian S. Munnelly for appellant.

Robert M. Spire, Attorney General, and Kenneth W. Payne for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Defendant-appellant, Leroy J. Parmar, was convicted by a jury in the district court for Douglas County of murder in the first degree in violation of Neb. Rev. Stat. § 28-303(2) (Reissue 1985), commonly called felony murder. He was sentenced to life imprisonment. Defendant timely appealed to this court, alleging only one error: that the trial court erred in overruling defendant's motion to suppress certain "evidence seized from the Defendant's residence; namely, a brown wooden-handled pneumatic pump action BB gun." Although we conclude that the trial court erred in admitting this BB gun into evidence, the error was harmless beyond a reasonable doubt. We therefore affirm defendant's conviction and sentence.

The facts supporting defendant's conviction are as follows. The victim, Frederick Cox, lived in apartment 10, 3453 Ames Avenue, Omaha, in a four-building apartment complex. Defendant resided in apartment 16, 3455 Ames Avenue, Omaha, with Lanetta Harrington. Michelle Carrigan lived in apartment 15, 3455 Ames Avenue, Omaha, with Lanetta Harrington's sister, Joyce Harrington, and a man named Truman Stevenson. The apartments were all in the same complex.

The record shows that on the evening of April 15, 1987, Cox received $1,000 cash from his ex-wife pursuant to a property settlement agreement in the divorce proceeding between those parties. The receipt of this money was shown by a receipt signed by Cox and given to his ex-wife. The next morning, Cox rode to work with his friend, Thomas Tyron. Tyron testified that Cox called him at home later that morning, telling Tyron that "he had his good fortune with him" and that he wanted to leave work early. Tyron picked Cox up from work at 11 a.m. The two men rode around for awhile, and Cox paid some debts he owed. Tyron then took Cox to the store, where he purchased groceries and alcohol. The two men spent the day socializing and drinking at various places and returned to the apartment complex at about 4:10 p.m. Tyron left Cox's apartment at about 6 p.m. Cox and others continued to celebrate Cox's "good fortune."

Michelle Carrigan first met Cox between 5 and 6 p.m. on April 16 in the hallway of his apartment building. Later that evening, Carrigan and Lanetta Harrington went to Cox's apartment. After some conversation, Harrington left and Carrigan engaged in an act of prostitution with Cox. Cox pulled some money from underneath the mattress and paid Carrigan, who observed at that time that Cox had hidden what appeared to be a "lot of money . . . [m]aybe a thousand," underneath his mattress. Cox invited Carrigan to stop back later.

Carrigan returned to her apartment and talked with a group of people, including Joyce Harrington, Truman Stevenson, and Lanetta Harrington. She told Lanetta about Cox's money. Defendant eventually joined the group, and, as the evening progressed, the subject of Cox's money came up again.

Carrigan testified that she and defendant talked about how much money Cox might have had. Carrigan further testified that she and defendant discussed a specific plan to take the money. The plan was that Carrigan would go knock on Cox's door. When Cox opened the door, defendant and Lanetta Harrington would rush in, causing Carrigan to be pushed into Cox. In the process, defendant and Harrington would tie him up and rob him. The act was designed to make it appear that Carrigan did not have anything to do with the robbery.

Carrigan later joined Lanetta Harrington and defendant at their apartment and saw that defendant and Harrington had some extension cord, rope, and pieces of cutoff panty hose. Carrigan testified that defendant "got together" a BB gun, extension cord, and the nylons.

The three carried out the plan at about 2 on the morning of April 17. Carrigan knocked on the door. When Cox answered, defendant and Harrington rushed up from the stairs and pushed Carrigan into the apartment. As defendant and Harrington wrestled with Cox, a woman named Valerie Washington came out of the bedroom and asked what was going on. Carrigan said she did not know. Washington left, followed by Carrigan.

Carrigan went back to her own apartment, but eventually returned to Cox's apartment. She went to the bedroom and saw Lanetta Harrington tying Cox's legs. Carrigan testified that defendant was "down by the top of Mr. Cox" but the bed obstructed her view. Carrigan told them they should get out. She left Cox's apartment and went into the parking lot, where she saw Ronnie Franks, a part-time caretaker, picking up glass.

Valerie Washington testified that she had gone to Cox's apartment for a drink late on the night of April 16, possibly after midnight. While she was in the apartment, someone knocked on the door. Cox answered the door, said it was Michelle Carrigan, and told Washington to go in the back room. As he started to open the door, some people pushed their way in. Carrigan was knocked onto the couch, and defendant and Lanetta Harrington came in. Washington testified that defendant "pounded Fred Cox on the coffee table and to the ground." Although defendant and Harrington had panty hose

over their faces, Washington testified that she recognized them because she knew them. Washington did not remember seeing them carrying anything. As Washington ran to her own apartment, she saw Franks cleaning the parking lot. She later returned to the parking lot and saw defendant and Harrington come out of Cox's building.

Ronnie Franks testified that while he was picking up glass late on the night of April 16, he saw Valerie Washington, two other women, and a man out in the parking lot. Franks stated that the man "had some gloves and he had a little gun, a rifle, some type rifle." Franks identified defendant in court as the man he had seen in the parking lot and testified he knew defendant as the man who lived in apartment 16.

Thomas Tyron returned to Cox's apartment complex at 6:30 on the morning of April 17 to take Cox to work. Tyron thought Cox had overslept, because there were no lights on. He tried knocking on the door, but there was no answer. Tyron took his wife to work and returned to Cox's apartment and knocked on the door again, to no avail. He called Cox's employer and determined that Cox had not gone to work that morning. Tyron went home and called Cox's employer again. After another unsuccessful trip to Cox's apartment, Tyron and a friend, Thomas Jeffrey, went to look for Cox.

Tyron and Jeffrey went back to Cox's apartment at 11 a.m. There was no response to their knocking, and they could not find the landlord to let them in. Tyron and Jeffrey returned to Cox's apartment at noon. There was still no response to their knocking on the door. Both men then looked through a crack in the doorframe and saw that the living room was in disarray. They jimmied the door with a knife and entered the apartment.

Jeffrey testified that the apartment was "all disarrayed" and that it appeared there had been a struggle. The couch was overturned, the coffee table broken, lamps were on the floor, and the refrigerator door was open.

Jeffrey went into the bedroom, examined the dresser, and then saw Cox's feet over by the bed. Jeffrey called Tyron into the bedroom. They observed that Cox had been bound at the arms and ankles and that the body was "cold and sticky." The body was wedged between the bed and the wall, with the face

turned down into the carpet.

Dr. Wayne Roffman, a pathologist, performed an autopsy of Cox's body on April 18. He noted that Cox had a long history of heart disease and was of the opinion that Cox died of "anoxia associated with asphyxiation in association with coronary artery disease." Dr. Roffman was of the opinion that the death was due to a combination of factors and that the information he had concerning the condition and position of the body was consistent with "positional asphyxiation." The doctor explained that because Cox was intoxicated and had been bound face down on a carpet in a confined area, he was unable to move to a position where he could breathe.

In the course of their investigation of this incident, Omaha Police Detectives Paul Briese and Timothy Conahan interviewed Ronnie Franks on the afternoon of April 17. Briese also was instructed to draft an affidavit for a search warrant for defendant's apartment. The resulting "Affidavit and Application for Issuance of a Search Warrant," signed and sworn to by Officer John Newell and Conahan, stated, in part:

> That the Affiant has just and reasonable grounds to believe, and does believe that there is concealed or kept as hereinafter described the following property, to-wit: 1 pneumatic pump action BB gun with a brown handle and blue steel in color as well as a pair of dark grey women's nylon pantihose along with records indicating the residents of the address 3455 Ames Ave., Apt. #16.
>
> . . . .
>
> That said property is under the control or custody of HARRINGTON, Lanetta D. . . . and John or Jane Doe.
>
> That the following are the grounds for issuance of a search warrant for said property and the reasons for the Affiant's belief, to-wit: On Friday 17 Apr 87, the Omaha Police Homicide Unit along with the Omaha Police Uniform Field Bureau and Criminalistics Unit were called to the address of 3453 Ames Ave., Apt. #10, the address of the late Frederick COX . . . found to be bound with his hands behind his back and his bindings consisted of a white extension cord and his feet and ankles bound together by a dark grey colored women's pantihose and he

was found lying face down along the north wall in the bedroom of the one bedroom apartment located at 3453 Ames Ave., Apt. #10, Omaha, Douglas County, Nebraska.

Officers of the Omaha Police Division conducted an investigation into this matter regarding the death and bondage of the victim Frederick COX . . . and after interviewing several witnesses and those witnesses being identified as Truman STEVENSON . . . as well as a Ronnie FRANKS . . . . These parties advised Omaha Police investigators that they had information as to who the suspects were that were involved in this incident and as a result of that investigation officers learned that the victim COX had earlier on the date of Friday 17 April 1987 been in the accompaniment [sic] of one Michelle CARRIGAN . . . . Reporting officers . . . located Michelle CARRIGAN and this party was taken to Central Police Headquarters where she gave a taped statement implicating the individuals Leroy PARMAR and Lanatta [sic] HARRINGTON as being the two individuals who assaulted the victim COX, Frederick by bursting into his apartment, knocking him to the ground and subsequently taking him to the bedroom where he was bound and gagged and later on found to be deceased. Witnesses reported that the party Leroy PARMAR is the boyfriend of Lanatta [sic] HARRINGTON and that these parties reside at the address of 3455 Ames Ave., Apt. #16, the location listed in this affidavit and application . . . .

Based upon the information obtained from those witnesses at the scene of the homicide of Frederick COX, affiant officers believe that if the court should authorize them to execute a search warrant on the address of 3455 Ames Ave., Apt. #16 in Omaha, Douglas County, Nebraska, they will be able to find evidence that will be needed in order to prosecute the parties Lannata [sic] HARRINGTON . . . and . . . PARMAR, Leroy J., . . . on a charge of felony murder.

Newell and Conahan took the application and search warrant to be signed by a county court judge. The warrant

signed by the county judge authorized the search of defendant's residence, and the seizure of the following items from the apartment: "1 blue steel and brown wooden stock pneumatic pump action BB gun along with a pair of dark grey women's pantihose and records pertaining to the occupants of the address of 3455 Ames Ave., Apt. #16." The officers proceeded to defendant's residence to serve the warrant. They tried to gain entry to the apartment by knocking, but there was no response. Consequently, Detective Briese forced the door open.

During the search of the southeast corner bedroom, the officers seized a brown vinyl briefcase containing various types of drug paraphernalia; a maroon billfold containing defendant's identification; a bill addressed to Lanetta Harrington; two nylon stockings (black and brown), cut and tied at the top; and a "Power Master 760 BB repeater." The billfold, which had been seized as a venue item, was later discovered to contain $240 in cash.

Defendant subsequently filed a motion to suppress evidence, alleging:

2. That the affidavit in support of the issuance of the search warrant does not allege the relevance of a pneumatic punch [sic] action BB gun to the crime being investigated. In spite of that fact, the search warrant approved by the magistrate specifically grants those executing the search warrant to search for such a BB gun. Absent any mention of said BB gun in the supporting affidavit, there is no probable cause to believe any BB gun was relevant to the investigation and the portion of the warrant allowing for the search of the BB gun is, therefore, defective.

. . . .

6. That the so-called good faith exception has no application herein in that the facts are distinguishable from *U.S. v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984), and further that this motion is based in part on State constitutional grounds.

Defendant prayed that the evidence seized be suppressed.

At the hearing on defendant's motion to suppress, the State offered copies of the search warrant and affidavit without

objection. It is apparent from the face of the affidavit itself, and Detective Briese so testified, that the affidavit contained no factual information regarding the relevance of a BB gun to the investigation. Briese further testified that the affidavit did not set out a factual basis why the police wanted to seize the BB gun.

Over defendant's objection, Briese was allowed to testify at the suppression hearing that at the time he drafted the affidavit, he had been advised by the other investigating officers (who had interviewed Carrigan and Franks) that a pneumatic BB gun was relevant to the investigation. Briese also testified, over objection, that he "overlooked it when [he] drafted the probable cause for the issuance of the search warrant. It [was] an oversight on [his] behalf as to not indicating the two or three sentences why [they] wanted the BB gun." Detective Conahan testified, over objection, that Franks had told him that he saw one of the suspects coming out of the apartment carrying a rifle, which Conahan later determined to be a BB gun. Conahan further testified that although the county judge asked questions about the affidavit, Conahan did not believe he told the judge anything that was not included in the affidavit.

Defendant testified at the hearing that he resided at 3455 Ames, apartment 16, on April 17, 1987.

Defendant's motion to suppress was overruled. He contends on appeal that the district court erred in overruling the motion to suppress evidence seized from his residence, namely, a brown wooden-handled pneumatic pump action BB gun, (1) because the supporting affidavit was so inadequate that any official belief in the existence of probable cause cannot be deemed reasonable, and the reasoning of *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), does not apply, and (2) because the court erred by allowing the affidavit to be remedied by subsequent testimony concerning the subjective knowledge of the officer who sought the warrant.

We note that defendant's assignments of error pertain only to his motion to suppress evidence of the BB gun. The invalidity of part of a search warrant does not require the suppression of all evidence seized pursuant to valid portions of the warrant. *State v. LeBron*, 217 Neb. 452, 349 N.W.2d 918 (1984). We limit our discussion accordingly.

Search warrants may be issued by an impartial magistrate, upon a showing of "probable cause." We have said that

"probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' [citation omitted] that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required."

*State v. Haselhorst*, 218 Neb. 233, 237, 353 N.W.2d 7, 10 (1984) (quoting *Texas v. Brown*, 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983)); *State v. Holman*, 221 Neb. 730, 380 N.W.2d 304 (1986).

We also have held that in determining the validity of a search warrant, the reviewing court may consider only information brought to the attention of the issuing magistrate. *State v. Hodge and Carpenter*, 225 Neb. 94, 402 N.W.2d 867 (1987). See, also, *Whiteley v. Warden*, 401 U.S. 560, 565 n.8, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971), where the Supreme Court stated: "Under the cases of this Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate." The affidavit submitted to the county judge failed to establish any cause for the seizure of the BB gun, specifically listed as an item to be seized. The affidavit did not set out how such evidence would be useful to the investigating officers as evidence of the crime. It was error for the trial court to allow the affidavit to be remedied at the suppression hearing by subsequent testimony concerning the subjective knowledge of the two affiants who sought the warrant.

The State contends, however, that the "good faith" exception to the exclusionary rule renders this item admissible. We disagree.

In *United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), the U.S. Supreme Court held that "the marginal or nonexistent benefits produced by suppressing

evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." The Court noted, however, that an officer would not "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " 468 U.S. at 923. The *Leon* case further stated at 468 U.S. at 919 n.20: "We emphasize that the standard of reasonableness we adopt is an objective one."

In *State v. Pecha*, 225 Neb. 673, 407 N.W.2d 760 (1987), we held that a warrant authorizing the search of "John and/or Jane Doe" was an invalid general warrant because the inclusion of the catchall phrase "John and/or Jane Doe" was not based upon any probable cause. In reaching our conclusion, we noted:

> Nothing in the affidavit filed by Officer Clark even made reference to a belief that there were or would be persons other than Edna Mohr and Stephen Pecha on the premises who were or might be involved in illegal activity. No evidence was introduced to show that there was anyone else residing at or in control of the premises other than Edna Mohr and Stephen Pecha.

*Id.* at 681, 407 N.W.2d at 765. We then concluded that the defect in the warrant was apparent on its face, and that the good-faith exception created in *Leon, supra*, did not apply.

Similarly, in *U.S. v. Hove*, 848 F.2d 137 (9th Cir. 1988), the affidavit submitted to the magistrate in support of a search warrant failed to link Hove to the address of the residence searched, and failed to explain the significance or relevance of searching the particular location. The U.S. Court of Appeals stated:

> The test for reasonable reliance is whether the affidavit was sufficient to "create disagreement among thoughtful and competent judges as to the existence of probable cause." *Leon* 468 U.S. at 926, 104 S.Ct. at 3422. . . . Here, reasonable judges could not disagree over whether probable cause existed to search the DeAnza location because the affidavit offers no hint as to why the police wanted to search this residence. . . . No such facts were

stated in this affidavit. Thus, any official belief in the existence of probable cause must be considered unreasonable.

*Hove, supra* at 139-40. The court emphasized that the *Leon* test for good-faith reliance is an objective test, and it is based solely on facts presented to the magistrate. Thus, facts subjectively relied upon by the affiant but excluded from the affidavit do not establish that an officer acted in objectively reasonable reliance upon a subsequently invalidated search warrant.

We agree with the *Hove* court that *Leon* creates an exception to the exclusionary rule only when officers have acted in objectively reasonable reliance on the ruling of a judge or magistrate.

The point is that officers who present a colorable showing of probable cause to a judicial officer ought to be able to rely on that officer's ruling in executing the warrant. [Citation omitted.] When the officers have not presented a colorable showing, and the warrant and affidavit on their face preclude reasonable reliance, the reasoning of *Leon* does not apply. To permit the total deficiency of the warrant and affidavit to be remedied by subsequent testimony concerning the subjective knowledge of the officer who sought the warrant would, we believe, unduly erode the protections of the fourth amendment.

*Hove, supra* at 140.

In this case, the affidavit of Officers Newell and Conahan was facially defective in failing to establish probable cause to seize a BB gun from defendant's residence, and the trial court erred in allowing the affidavit to be remedied at the suppression hearing by testimony concerning the subjective knowledge of the affiant officers, and in later admitting the BB gun in evidence. The admission of the evidence is the operative fact. In that connection, we note that appellant's brief at 12 states the gun was received in evidence as shown at page 238 of the bill of exceptions. At that page, the BB gun is specifically excluded from evidence. The BB gun was later admitted into evidence, at page 504, and we assume defendant's contentions are with that evidentiary ruling.

Our decision in *Pecha, supra*, supports the conclusion that

the officers could not reasonably objectively rely upon this facially invalid warrant in seizing a BB gun from defendant's residence and that the good-faith exception to the exclusionary rule does not apply in this case. The trial court erred in failing to exclude evidence of the BB gun.

The remaining issue is whether the erroneous admission into evidence of the BB gun was harmless beyond a reasonable doubt. *State v. Oliva*, 228 Neb. 185, 422 N.W.2d 53 (1988); *State v. Watkins*, 227 Neb. 677, 419 N.W.2d 660 (1988).

Defendant contends that the BB gun was relevant and prejudicial because the gun was an instrument of the crime and also corroborated the testimony of the State's main witness, Michelle Carrigan, who he claims was "fairly discredited" on cross-examination. Defendant further claims that evidence of the BB gun was prejudicial because it corroborated Franks' testimony and tended to put the gun at the scene of the crime.

The record shows that the BB gun was referred to approximately eight times in the course of 7 days of testimony. Franks testified, over objection, that the man he saw in the parking lot was carrying a "little gun" or a "rifle," and that the BB gun looked like the gun he saw. Franks, however, was able to independently identify defendant as the man he saw that night.

The next reference to the BB gun is Michelle Carrigan's testimony during direct examination that it was defendant's gun and that defendant "got together" the BB gun, extension cord, and nylons before he went to Cox's apartment. There was no objection to this testimony.

Detective Briese testified during direct examination that he had been instructed to draft an affidavit for a search warrant for defendant's residence. Briese assisted in executing the warrant and testified that "[w]e were looking for a BB gun that had a brown handle, nylon hose . . . and venue items." On cross-examination, he testified as to the phrase "BB gun" in the search warrant and affidavit.

Officer Newell testified during direct examination that he and Detective Conahan had taken an application for a search warrant to the county judge's house and that they executed the warrant. Newell stated only that "[t]he items listed in the

warrant were some nylon stockings possibly worn in the crime. A pneumatic BB gun with a brown wooden stock and handle, and items of venue." Newell identified the BB gun as the gun found in defendant's apartment. The BB gun was listed on their property report.

Defendant, testifying in his own defense, stated that "[a] friend of mine had [the BB gun] and he left it over to the house, and it's been over there for about two months under the bed."

In the context of the whole trial, the foregoing references to the BB gun are inconsequential. There is no testimony, direct or circumstantial, that the BB gun was used in striking, shooting, or threatening Cox on the night in question or that the BB gun was even taken into Cox's apartment. Washington testified that she did not see defendant, Lanetta Harrington, or Carrigan carrying anything when they burst into Cox's apartment. Carrigan did not testify that the BB gun was taken into Cox's apartment. Both Washington and Carrigan testified to a physical assault of Cox without the mention of any weapon or club.

Both Franks and Washington identified defendant by recognizing him as a resident of the apartment complex and the man they had seen on the night in question. Franks' passing reference to the gun was not needed by him in identifying defendant. There is the further fact that a BB gun does not automatically cause the prejudice which might be caused by the presence of AK-47 assault weapons, or similar automatic, lethal guns.

Both Washington, an independent witness, and Michelle Carrigan, an accomplice also charged with first degree murder in Cox's death, testified directly to acts of defendant resulting in the death of Frederick Cox. Each was cross-examined at length as to all the sordid aspects of their testimony. Substantial circumstantial evidence also connected defendant with the robbery and murder. The BB gun was of slight relevance to any issue in the trial.

The U.S. Supreme Court has often recognized the doctrine of "harmless error." The Court said in *Rose v. Clark*, 478 U.S. 570, 576, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986), that

since [*Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)], "we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U. S. 673, 681 (1986). That principle has been applied to a wide variety of constitutional errors.

The holding of "harmless error" is applied on a case-by-case basis. In this case, although the court erred in failing to suppress the BB gun as evidence, we determine that the error was harmless beyond a reasonable doubt. The judgment of the trial court is affirmed.

AFFIRMED.