STATE OF NEBRASKA, APPELLEE,
v. RUSSELL S. PITTMAN, APPELLANT.
556 N.W.2d 276

Filed November 19, 1996.   No. A-96-120.

Jeanelle S. Kleveland, of Kleveland Law Office, for appellant.

Don Stenberg, Attorney General, and Jay C. Hinsley for appellee.

MILLER-LERMAN, Chief Judge, and HANNON and MUES, Judges.

MILLER-LERMAN, Chief Judge.

Russell S. Pittman was arrested on March 17, 1995, and subsequently charged with violation of a protection order, a Class II misdemeanor, and possession of a short shotgun, a Class IV felony. The charges were later amended to include a Class II felony, attempted kidnapping, and a Class III felony, possession of a deadly weapon during commission of a felony, to wit: attempted kidnapping. Following a bench trial in the district court for Saunders County, Pittman was convicted of all four counts and sentenced consecutively to 6 months' imprisonment for violation of a protection order, 4 to 5 years' imprisonment for possession of a short shotgun, 20 to 25 years' imprisonment for attempted kidnapping, and 10 to 15 years' imprisonment for possession of a deadly weapon during commission of a felony. Pittman appeals his convictions and sentences to this court. For the reasons set forth below, we affirm the judgment of the district court.

## ASSIGNMENTS OF ERROR

As summarized, Pittman alleges that the district court erred in (1) overruling his motions to suppress evidence obtained from his vehicle and his home, (2) determining that there was probable cause to arrest him, (3) admitting certain evidence and testimony, (4) finding that there was sufficient evidence to convict him of each of the charges, and (5) imposing on him excessive sentences.

## STANDARD OF REVIEW

While in a bench trial of a criminal case the court's findings have the effect of a verdict and will not be set aside unless clearly erroneous, an appellate court has an obligation to reach

an independent, correct conclusion regarding questions of law. *State v. Carpenter*, 250 Neb. 427, 551 N.W.2d 518 (1996).

## FACTS

*Background.*

Around 1:45 a.m. on March 17, 1995, Dina F., manager of the Czechland Inn in Prague, Nebraska, was working alone while completing her closing duties at the bar. As she prepared to leave, she saw a man peeking at her through a window. Dina looked outside to see if any cars were parked nearby. Looking out the back door, she noticed an unfamiliar unlicensed car parked at the back of the bar, and she observed someone ducking to the side of the car. Dina testified that she believed that the person was Pittman, her estranged husband. Dina and Pittman each had a protection order against the other. Dina stated that she called out to Pittman by name and called him "chicken shit" and that, after a few minutes, he stood and began walking toward the bar. Dina testified that she told him to leave or she would call the police and that Pittman responded by saying that he intended to contact the police himself because Dina had called him "fucker," a violation of the protection order. Pittman then drove the car to the front of the bar, parked it next to Dina's car, and stood in front of his car. He told Dina that he would not leave until they talked, but eventually, apparently believing that Dina had called police, he walked to a pay phone a block away, called the 911 emergency number, and spoke with Saunders County Deputy Sheriff Shannon Sydik. Sydik stated that Pittman asked if a call had been received from Dina and that Sydik told him that no such call had been received. Pittman complained to Sydik that Dina was harassing him, and Sydik advised him to go home. Pittman returned to the bar area, and Dina called a friend and asked that she call the police for Dina.

*Suppression Hearing.*

Sydik testified at the suppression hearing that she arrived at the scene to find Pittman sitting in a brown vehicle in front of the bar. The vehicle had no license plates, and Pittman carried no identification with him. After speaking with Pittman and learning his name and birth date, Sydik contacted the dispatcher

and ascertained that there were no outstanding warrants for Pittman. Sydik initially testified that she asked the dispatcher at this time if there was a protection order for Pittman and was informed that there was. On cross-examination, Sydik could not state at what point while she was at the scene of the incident she was informed of the protection order. Sydik acknowledged that neither Pittman nor Dina showed her a copy of a protection order.

Pittman told Sydik that he had been awakened by a bad dream at his home in Schuyler, Nebraska, went for a drive, and ended up in Prague, where he decided to drive by and say hello to Dina. Pittman denied to Sydik that he had any weapons in the car. After a backup officer arrived, Sydik spoke with Dina inside the bar. Sydik testified that she arrested Pittman for violation of a protection order because "it was after 2 o'clock in the morning; the business was normally closed; he wasn't from Prague, and that Dina [F.] did seem quite frightened."

Pittman was arrested and placed in the backup officer's vehicle. Sydik testified that she then searched Pittman's car incident to his arrest. She described the car as a hatchback model that had a large cargo area because the rear seat was folded down. When Sydik folded the rear seat back up, she discovered a duffelbag, on top of which lay a sawed-off shotgun and a pry bar. The shotgun contained a single shotgun shell. Inside the duffelbag were a shotgun shell, a pair of wirecutters, and a number of plastic cable ties, referred to by Sydik as "Flex-cufs." Two Flexcufs were hooked together in a figure-eight form, similar to handcuffs. Pittman was charged with possession of a short shotgun and violation of a protection order.

Edward Mentzer, a detective sergeant with the Saunders County Sheriff's Department, testified that Sydik contacted him on March 17, 1995, stating that she had arrested Pittman for violation of a protection order and that "she had some concerns that he may have been involved in something more serious than that even." Based primarily on Sydik's written police report of the bar incident, Mentzer drafted an affidavit and search warrant for Pittman's residence in Schuyler, which warrant was signed by a judge.

The affidavit stated that the affiant had reasonable grounds to believe that Pittman's residence contained the sawed-off portion of the barrel of the shotgun and "[l]etters, Diaries, or correspondence which indicate Russell Pittman's lethal intentions toward Dina [F.]" The affidavit contained information Mentzer received from Sydik recounting the events at the bar. In addition, the affidavit stated that Pittman's criminal history had been checked and that he had an extensive record, including charges for kidnapping, false imprisonment, and sexual assault. Quoting Sydik, the affidavit stated, in part, that

> [a]fter finding the sawed off shotgun, the pry bar, the flexicuffs [sic] and wire cutters in Mr. Pittman's vehicle I have some real concerns as to what Mr. Pittman's intentions were for coming to Prague and contacting his ex-wife. The fact that he was behind the bar hiding behind his vehicle when she went out the back door. If Mr. Pittman was waiting in hiding for her to leave the bar through the back door. The [s]awed off shotgun, the prybar, flexicuffs and wire cutters were altogether [sic] in the vehicle, possibly he brought the pry bar to break into the bar or her residence[,] the flexicuffs to restrain her and the wire cutters possibly to cut telephone lines. The shotgun was loaded and one extra shell was found in the duffel bag, possibly one shell would be intended for Dina and the second shell for himself. This may be speculation but due to his past criminal record, I think it shows Mr. Pittman could be a real danger.

During the search of Pittman's residence, officers discovered in the master bedroom closet a cardboard box used to ship a firearm. The box contained the same serial number as that on the sawed-off shotgun found in Pittman's car. During the search, Mentzer discovered six audiotapes in a paper bag on top of a shelf in the living room. The tapes were reviewed on site and seized because officers felt they contained material coming within the scope of the search warrant. In addition, 10 handwritten notes or poems were found in a dresser drawer and underneath a shelf in the master bedroom.

Most of the notes and poems appear to be suicide notes to Pittman's sons, mother, and siblings. The note addressed to Dina does not specifically refer to suicide, although it says that

"[t]his poem I write will be the last you see for you don't want to know the Best of me." This letter does not appear to contain a threat to Dina. However, one unaddressed note, exhibit 17, refers to someone who "never really had time for me" and ends with the following:

> The sting is so deep to me that one last specticle [sic] you will see[.] As I place a gun to my head and pull the trigger in front of you and I'm dead. The things I'll do to you before I go should help ease your consience [sic] after the show.

It appears that the audiotapes were meant to be suicide tapes to Dina and to Pittman's mother, father, sons, and siblings. Mentzer stated that he understood exhibit 17, in conjunction with the other items found at Pittman's residence, to mean that Pittman "intended to commit suicide after he had done whatever it is he thought he was going to do." Mentzer then seized the remaining notes, poems, and audiotapes, items that he felt reinforced his impression that Pittman intended suicide.

The trial court overruled Pittman's motion to suppress the notes, poems, and audiotapes, stating that they "all either relate to the alleged victim, Dina [F.], or present admissions relating to defendant's past offenses against Dina [F.], or complete the picture of a person with nothing left to lose by committing yet more offenses against Dina [F.] and then committing his planned suicide in front of her." The court held that seizure of those items, as well as seizure of the shotgun shipping container, did not exceed the scope of the warrant. The trial court also overruled, without comment, Pittman's motion to suppress evidence taken from the vehicle.

*Trial.*

The trial court took judicial notice of much of Mentzer's testimony from the suppression hearing. In addition, Mentzer testified that on April 4, 1995, a second search warrant was executed at Pittman's home. The search warrant was based on items discovered at Pittman's home during the first search but which Mentzer felt were beyond the scope of the first search warrant. Officers executing the first search warrant had discovered in the master bedroom chains and dog collars affixed to Pittman's bed

and also found what Mentzer called "marital aids," which were a variety of sex toys, collars, and restraints (hereinafter referred to as "devices"). Photographs taken by officers at the time of the first search were introduced into evidence. The photographs show that the bedding had been removed and that chains and collars were attached to the bedposts. Additional collars were set on furniture nearby. With the exception of one chain, these chains, collars, and devices were no longer at Pittman's residence when officers returned on April 4 to execute the second search warrant.

Dina testified at trial to the events at the bar. In addition, she described a number of incidents of nonconsensual sex, estimated by her at 20 in number, that took place during her marriage to Pittman. She identified some of the devices as having been forcibly used on her by Pittman.

Pittman's ex-wife from an earlier marriage, Lisa K., testified over Pittman's continuing objection based on relevancy and on inadmissibility as a prior "bad act." Lisa testified that she had been raped by Pittman several times during their marriage. Following one of those incidents, Pittman was charged with sexual assault. Lisa stated that Pittman had never kidnapped her or used restraints on her. The trial court ruled that Lisa's testimony was admissible only with regard to the issue of intent as it related to the kidnapping charge against Pittman.

Lisa also testified that the cable ties found in Pittman's car were similar to those Pittman often used when he worked installing car stereos during their marriage. She said that he had never used the ties for any other purpose.

The trial court found Pittman guilty of all four counts. He was sentenced to 6 months' imprisonment for violation of a protection order; 4 to 5 years' imprisonment for possession of a short shotgun; 20 to 25 years' imprisonment for attempted kidnapping; and 10 to 15 years' imprisonment for possession of a deadly weapon in the commission of a felony. The sentences are to run consecutively.

## ANALYSIS

*Search of Vehicle.*

Pittman argues that Sydik had no probable cause to believe that he was in violation of a protection order at the time of

arrest. Thus, according to Pittman, the arrest was unlawful, the subsequent search incident to arrest was invalid, and the trial court's decision to overrule Pittman's suppression motion was erroneous.

A trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996). This court is also aware that on May 28, 1996, the U.S. Supreme Court stated in *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996), that

> as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.

In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *Id.*

Pittman correctly notes that Neb. Rev. Stat. § 42-928 (Reissue 1993) provides that an officer shall arrest a person for violation of a protection order if (1) the officer has probable cause to believe that the person has violated such an order and (2) the applicant for the protection order has provided the officer with a copy of the order or the officer determines that such an order exists after communicating with the local law enforcement agency. Pittman contends that Sydik did not have probable cause to believe that he had violated a protection order. He points to evidence which he asserts shows that he had called police to the scene; that when Sydik arrived, Pittman was sitting in his vehicle in a well-lit area in front of the bar; that he did not attempt to enter the bar or to remove Dina from the bar; that he stayed in front of the bar in a well-lit area; that he made no gestures or motions of any kind toward Dina; and that he did not threaten, assault, molest, stalk, attack, or otherwise disturb Dina's peace, as prohibited by the protection order.

A fair reading of the record consistent with the trial court's denial of the motion to suppress is that Pittman was prowling around the bar area after hours and peeking in the windows until spotted by Dina; that he initially parked his vehicle in back of the bar where Dina apparently could not see it through the windows; that he refused to identify himself to Dina for a time; that he subsequently parked his vehicle in such a way that Dina could not reach her own vehicle without passing Pittman; and that he refused to leave the area even after Dina threatened to call police. The protection order prohibited Pittman from, inter alia, "[i]mposing any restraint upon the personal liberty" of Dina. Pittman's actions clearly resulted in Dina's inability to leave her workplace in the early morning hours to return home, despite her repeated requests that Pittman simply leave. The above actions provided Sydik with probable cause to believe that Pittman had violated the protection order. Although we recognize that Sydik's testimony is at times unclear and tentative, the trial court, in overruling Pittman's motion to suppress evidence obtained from the vehicle, implicitly accepted the officer's testimony that she gained knowledge of the protection order before Pittman's arrest.

Once there has been a valid arrest, a search incident to that arrest is valid if conducted in the area within the arrestee's immediate control, the area from within which the arrestee could gain possession of a weapon or destructible evidence. *State v. Sassen*, 240 Neb. 773, 484 N.W.2d 469 (1992). When a "[police officer] has made a lawful custodial arrest of the occupant of an automobile, [the officer] may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" and "containers found within the passenger compartment." *New York v. Belton*, 453 U.S. 454, 460, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981). It has been held that a search of a defendant's vehicle while the defendant was at the scene handcuffed in a police car was proper. *U.S. v. White*, 871 F.2d 41 (6th Cir. 1989).

At the time of Pittman's arrest, Sydik told him to step out of his vehicle and he was patted down, handcuffed, and placed in the backup patrol car. Sydik then conducted the search of Pittman's vehicle. The evidence in question was found in the

back area of the car, from which Pittman could have gained possession of the shotgun and other items. Thus, Sydik conducted a valid search incident to Pittman's arrest. Because the trial court was not clearly wrong in overruling Pittman's motion to suppress evidence taken from the vehicle, Pittman's first assignment of error is without merit.

*Search of Home.*

Pittman argues generally that the trial court erred in overruling his motion to suppress evidence obtained from his home. He specifically contends that the affidavit was insufficient in that it failed to establish probable cause to believe that there would be any letters, diaries, or correspondence relating to Dina at his residence. We need not reach this issue.

In the instant case, the affidavit indicates that a search of the house was appropriate to search, inter alia, for the sawed-off portion of the shotgun. In view of the condition of the gun found in Pittman's vehicle, there was probable cause to believe the remainder of the barrel would be found at his residence. At the time of the search, Pittman had been arrested for possession of a short shotgun and violation of a protection order. It is reasonable to assume that in searching for the remainder of the barrel, officers would search in closets and bureau drawers and in paper sacks or other containers for such an item. The chains, dog collars, and devices were physical items in plain view as officers entered the master bedroom or were otherwise properly observed by the officers pursuant to the valid portion of the search warrant pertaining to the sawed-off shotgun.

Pittman's assignment of error pertains only to the portion of the search warrant relating to the letters, diaries, or correspondence. "The invalidity of part of a search warrant does not require the suppression of all evidence seized pursuant to valid portions of the warrant." *State v. Parmar*, 231 Neb. 687, 695, 437 N.W.2d 503, 509 (1989). Quoting *United States v. Fitzgerald*, 724 F.2d 633 (8th Cir. 1983), the Nebraska Supreme Court discussed the severability of a warrant in *State v. LeBron*, 217 Neb. 452, 454-55, 349 N.W.2d 918, 921 (1984), as follows:

"Accordingly, we follow the approach which the First, Third, Fifth, Sixth, and Ninth Circuits, and several states,

have adopted, and hold that, absent a showing of pretext or bad faith on the part of the police or the prosecution, the invalidity of part of a search warrant does not require the suppression of all the evidence seized during its execution. More precisely, we hold that the infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant (assuming such evidence could not otherwise have been seized, as for example on plain-view grounds during the execution of the valid portions of the warrant), but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized—on plain view grounds, for example—during their execution). This approach, we think, complies with the requirements of the fourth amendment."

In view of the fact that the affidavit and search warrant pertaining to the remainder of the sawed-off shotgun were proper, and because the search therefor revealed the chains, collars, and devices in plain view, we find that these items were properly seized and admitted into evidence. The seizure of the notes, letters, and correspondence may well have exceeded the portion of the warrant permitting a search for physical items; however, even if we assume that the portion of the search warrant authorizing the search for notes, letters, and correspondence was invalid, the admission of these items was not necessary to sustain Pittman's conviction, and, therefore, we need not rule on this assignment of error pertaining to their seizure. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (holding that appellate court need not decide issue not necessary for resolution of case).

*Relevancy of Poems and Audiotapes.*

■ Pittman contends that the admission into evidence of the poems and audiotapes over his relevancy objection was an abuse of discretion which resulted in unfair prejudice to him. It is presumed in a bench trial that the judge was familiar with and applied the proper rules of law unless it clearly appears otherwise. *State v. Orduna*, 250 Neb. 602, 550 N.W.2d 356 (1996). We note that the evidence as to attempted kidnapping was sufficient to convict Pittman without the admission of the tapes

and notes. The remaining evidence includes Pittman's actions at the bar, the evidence found in his vehicle, and the chains, dog collars, and devices found in plain view in Pittman's bedroom. This assignment of error is without merit.

*Testimony of Lisa.*

■ Pittman argues that the trial court erred in admitting the testimony of his ex-wife from an earlier marriage, Lisa, who testified that Pittman had raped her a number of times during their marriage. The State offered her testimony as relevant to the issue of Pittman's motive and intent in attempting to kidnap Dina. The trial court ruled that Lisa's testimony was admissible only with regard to the issue of intent related to the charge of attempted kidnapping. Neb. Rev. Stat. § 27-404(2) (Reissue 1995) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ Section 27-404(2) is a rule of inclusion, rather than exclusion, and permits the use of relevant bad acts for all purposes except to prove the character of a person in order to prove that the person acted in conformity with that character. *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996). Evidence of other crimes or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question. *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993).

■ Pittman first claims that Lisa's testimony was insufficiently related to the offenses charged against him because the events she related were remote in time, having occurred in 1989. The admissibility of evidence concerning other conduct under the provisions of § 27-404(2) must be determined upon the facts of each case; no exact limitation of time can be fixed as to when other conduct tending to prove intent to commit the offense charged is remote. *State v. White, supra.* The question of

remoteness in time is largely in the discretion of the trial court; while remoteness in time may weaken the value of the evidence, such remoteness does not, in and of itself, necessarily justify the exclusion of the evidence. *State v. Rincker*, 228 Neb. 522, 423 N.W.2d 434 (1988). In this case, Pittman's history of sexually assaulting his ex-wife from an earlier marriage was not so remote in time as to justify its exclusion from evidence.

Pittman also notes that there was no kidnapping or restraint involved in the incidents with Lisa. He argues that, therefore, the incidents are not sufficiently related in circumstance to the current charges against him. We disagree. The State's theory of this case was that Pittman intended to abduct Dina for the purpose of sexually assaulting her. Pittman's history of sexually assaulting Lisa is relevant to show his intent with regard to Dina. Pittman's assignment of error regarding Lisa's testimony is without merit.

*Sufficiency of Evidence.*

Pittman argues that the evidence was insufficient to convict him of the charges against him. In determining whether evidence is sufficient to sustain a conviction in a bench trial, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. *State v. Carpenter*, 250 Neb. 427, 551 N.W.2d 518 (1996). A conviction in a bench trial of a criminal case is sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. *Id.*

With regard to the charge of violation of a protection order, Pittman argues that he did not commit any of the acts prohibited by the protection order. The protection order prohibited Pittman from, inter alia, "[i]mposing any restraint upon the personal liberty" of Dina. As stated above, Pittman's actions in refusing to leave the bar area where he was parked, so as to require Dina to pass him to reach her own vehicle, constitute sufficient evidence that he violated the protection order.

With regard to the charge of attempted kidnapping, Pittman contends that there is no evidence that he took a substantial step toward kidnapping Dina. We disagree.

"A person commits kidnapping if he abducts another . . . with intent to . . . [c]ommit a felony." Neb. Rev. Stat. § 28-313 (Reissue 1995). "Abduct shall mean to restrain a person with intent to prevent his liberation by: (a) Secreting or holding him in a place where he is not likely to be found; or (b) Endangering or threatening to endanger the safety of any human being." Neb. Rev. Stat. § 28-312 (Reissue 1995).

Criminal attempt is defined by Neb. Rev. Stat. § 28-201 (Reissue 1995) as follows:

> (1) A person shall be guilty of an attempt to commit a crime if he:
>
> (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or
>
> (b) Intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.
>
> (2) When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
>
> (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

In *State v. Sodders*, 208 Neb. 504, 304 N.W.2d 62 (1981), a defendant appealed his conviction for attempted first degree murder, claiming, in part, that Nebraska's criminal attempt statute was unconstitutionally vague. In rejecting the defendant's argument, the Nebraska Supreme Court discussed § 28-201 as follows:

> In adopting § 28-201(1)(b), our Legislature has accepted the position of the Model Penal Code that attempt liability is primarily concerned with the dangerous disposition of the actor, rather than just the dangerousness of such actor's conduct. However, it recognizes the legal

principle that the law does not seek to punish evil thought alone. Therefore, the statute requires that the dangerous disposition be manifested by some intentional act which would constitute a substantial step toward the completion of the crime if the circumstances were as the actor believed them to be. Model [Penal] Code art. 5, Comments (Tent. Draft No. 10, 1960); Hawaii Rev. Stat. § 705-500, Commentary at 285 (Repl. 1976).

*State v. Sodders*, 208 Neb. at 506-07, 304 N.W.2d at 64-65.

■ We appreciate the difficulty of identifying when an actor's disposition matures into an inchoate crime. Whether a defendant's conduct constitutes a substantial step toward the commission of a particular crime and is an attempt is generally a question of fact. *State v. Green*, 238 Neb. 475, 471 N.W.2d 402 (1991). Model Penal Code § 5.01(2) (1985) lists the following examples of such conduct:

(a) lying in wait, searching for or following the contemplated victim of the crime;

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

Under the above analysis, it is clear that Pittman's conduct constitutes a "substantial step" in several respects: Pittman was prowling around the bar after hours, peeking at Dina through

the windows, while apparently trying to keep her from identifying him; he repeatedly urged Dina to come out of the bar to "talk" and, when she refused, told her he would not leave until she did so; he had in his possession a loaded shotgun, a pry bar, wirecutters, and cable ties shaped into Flex-cufs, items which could serve no lawful purpose under the circumstances; and attached to his bed at home were chains and dog collars. Thus, Pittman's actions and the evidence found outside the bar supported the finding of attempted kidnapping, and the evidence properly seized at the house identified a felonious sexual assault as the object of the attempted kidnapping. In this regard, we note that given the scene at Pittman's house, the only logical inference at the time of the search was that Pittman intended to perpetrate nonconsensual activity on Dina, to wit: first degree sexual assault.

In addition, the testimony of Dina and Lisa supports the State's theory that Pittman's purpose in kidnapping Dina was to commit a sexual assault against her. The evidence, viewed and construed most favorably to the State, was sufficient to find that Pittman attempted to abduct Dina with the intent to commit a felony, i.e., sexual assault. This assignment of error is without merit.

Pittman also argues that the evidence is insufficient to convict him of the charges of possession of a short shotgun and possession of a deadly weapon in the commission of a felony. His arguments are premised on the issues of the legality of the search of his home and insufficiency of evidence to convict him for attempted kidnapping, respectively, which issues have been resolved against him. The evidence supports his conviction of possession of a short shotgun and possession of a deadly weapon in the commission of a felony. These assignments of error are without merit.

*Excessive Sentences.*

In his final assignment of error, Pittman claims that the sentences imposed by the trial court were excessive and constituted an abuse of discretion, particularly in light of the fact that no violence was actually committed by Pittman on March 17, 1995.

Pittman was sentenced to 6 months' imprisonment for violation of a protection order, in violation of Neb. Rev. Stat. § 42-924 (Reissue 1993), a Class II misdemeanor; 4 to 5 years' imprisonment for possession of a short shotgun, in violation of Neb. Rev. Stat. § 28-1203(1) (Reissue 1995), a Class IV felony; 20 to 25 years' imprisonment for attempted kidnapping, in violation of §§ 28-313 and 28-201, a Class II felony; and 10 to 15 years' imprisonment for possession of a deadly weapon in the commission of a felony, in violation of Neb. Rev. Stat. § 28-1205 (Reissue 1989), a Class III felony. The sentences are to be served consecutively.

A sentence imposed within the statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). Pittman has an extensive criminal history, including convictions for assault and false imprisonment. Pittman's sentences are well within the statutory limits. The trial court did not abuse its discretion in sentencing Pittman.

Pittman's assignments of error are without merit, and his convictions and sentences are affirmed.

AFFIRMED.