STATE OF NEBRASKA, APPELLEE, V. JOHN BYRON NEWMAN,
APPELLANT.

548 N.W.2d 739

Filed June 7, 1996.   No. S-94-833.

Dennis R. Keefe, Lancaster County Public Defender, and Webb E. Bancroft for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

After the jury found the defendant, John Byron Newman, guilty of first degree sexual assault, in violation of Neb. Rev. Stat. § 28-319(1) (Reissue 1989), the district court held an enhancement hearing at which it was determined that this was not Newman's first such conviction. In accordance with the provisions of Neb. Rev. Stat. § 28-105 (Reissue 1989) and § 28-319(2) and (3), the district court then sentenced Newman to imprisonment for a period of not less than 25 nor more than 50 years, without the possibility of parole. Newman thereupon appealed to the Nebraska Court of Appeals, asserting, in summary, that the district court erred in (1) not suppressing certain evidence, (2) other evidential rulings, and (3) finding the evidence sufficient to support the conviction. The Court of Appeals affirmed the district court's judgment. *State v. Newman*, 4 Neb. App. 265, 541 N.W.2d 662 (1996). Newman

then successfully petitioned this court for further review. We now affirm the judgment of the Court of Appeals.

## II. FACTS

At approximately 11 p.m. on the evening of March 21, 1993, the victim fell asleep with her 3-year-old son while watching television in the living room of the Lincoln, Lancaster County, Nebraska, apartment in which they lived. During the early morning hours of March 22, she was awakened by a knock at the living room door. She got up and looked through the peephole and, seeing nothing, opened the door slightly. Now noticing a man outside, she asked if he had the wrong apartment. Replying that he did not, the man forced his way inside. As she backed away, the victim started hitting and kicking, and asked what he was doing. The man kept coming toward her and eventually pushed her down on the couch.

At this point, the victim was lying lengthwise on the couch with the man between her legs. As she threatened to scream, the man grabbed her by the throat and told her that if she did so, he was going to "bash [her] fucking head in." He then began squeezing her throat as he unfastened her belt and removed her clothing, which consisted of a green shirt, bra, jean shorts, underwear, shoes, socks, and a white T-shirt. The man then opened his pants, pulled them down past his buttocks, and unsuccessfully tried to insert his penis into the victim's vagina.

The man next picked the victim up in a "bear hug" and carried her into a bedroom. Once there, he threw her on the bed and again attempted coitus. Being again unsuccessful, he inserted a finger into the victim's vagina. At this point, although she had never seen him and did not know him, the man spoke the victim's name and told her that he had wanted to do this for awhile. The man then attempted to muffle the sound of the victim's cries by putting a pillow over her face.

After awhile, he got up, turned on the lights, and threw a blanket and pillow over the victim's face so she could not see. He again made an attempt to copulate; when this effort also failed, the man asked the victim to "more or less jack him off." She refused and started hitting him with her fist. The

man then suddenly stood up, turned off the light, and began to say repeatedly, " 'This didn't happen.' " The man next began putting on his clothes, all the while making sure that the blanket still covered the victim's face.

After the man had left the room, the victim stayed where she was until she heard a door shut. As she began to get up from the bed, the man came back into the bedroom and said, " 'I told you not to move.' " He then pushed her back down onto the bed, covered her head with a pillow, and left the room. The victim remained in the bedroom until she heard the man moving around and the door shut again. She then got up and went into the living room to check on her son and tried to call the police, but discovered that the line to that telephone had been cut. She also found that the clothing her attacker had removed from her had disappeared.

The victim called the Lincoln police from another telephone in the kitchen. She was still on the telephone with the dispatcher when the police arrived. The victim described her attacker as a Hispanic male between 5 feet 6 and 5 feet 8 inches tall, with an olive complexion, dark brown or black hair, and a mustache, and as wearing a white T-shirt, black pants, and a black leather jacket. She also told the police that she thought her attacker had a slight Hispanic accent "because he was short with the words and things" and sounded different than what she was accustomed to hearing.

Using a dog to track the trail of the suspect leading from the victim's apartment, the police were led to a dumpster where they recovered the victim's missing clothing. At trial, the victim identified the recovered items as the clothing she was wearing on the night of the assault.

After giving the police an account of the events, the victim was taken to a hospital where she was examined. Sometime later, she went to the police station, gave a statement, and with the aid of a computer created a composite sketch of her attacker.

While at the police station, the victim was shown a photographic array which did not contain Newman's picture and was asked if she could identify her attacker from among the six photographs she was presented. Although the victim did not

identify anyone as her attacker, she did point out that some of the men depicted had features similar to those of her attacker.

On March 23, 1993, the victim was shown a second set of six photographs which did not include Newman and again was asked if she could identify her attacker. She did not identify anyone depicted in the array as her attacker.

Two days later, on March 25, 1993, the victim was shown a third set of six photographs. The police officer who presented the photographs told the victim to take her time in examining them. However, the victim testified that she "knew immediately who it was, what number it was," and selected photograph No. 4, a picture of Newman.

After the victim had identified Newman as her attacker, the police determined that Newman had taken an Amtrak train to Las Vegas, Nevada. The Nevada police were notified, and pursuant to a fugitive arrest warrant, Newman was arrested at the Amtrak train station in Las Vegas. Immediately upon being arrested, Newman was frisked and handcuffed. The police discovered no contraband or weapons upon his person.

Newman had three dark-colored, soft-sided suitcases with him. Without attempting to first open the suitcases, the police put them in the trunk of their vehicle and transported Newman and the suitcases to a detention center. When Newman arrived at the detention center at approximately 8:50 a.m. on March 26, 1993, the processing officer asked Newman if he had any valuables to declare. Newman responded that he did and listed on an "Inmate's Property Inventory and Release" form a black wallet, two watches, a necklace, a $20,000 cashier's check, and bulk property composed of the three suitcases.

Later that morning, at around 10:30 a.m., the Nevada police contacted a Lincoln police detective and informed him that Newman was in custody. The detective asked if Newman was wearing a black leather jacket and white tennis shoes when he was arrested. Upon being told that he was not, the detective informed the police that the jacket and tennis shoes were needed as evidence. At approximately 11:15 a.m., two Nevada police officers went to the detention center property room and retrieved the requested items from one of Newman's suitcases.

On April 8, 1993, a Lancaster County deputy sheriff traveled to Las Vegas to pick up Newman. He logged Newman and his possessions, including the black leather jacket and white tennis shoes, into the Lancaster County jail on April 9. The deputy sheriff testified that he spoke with Newman during the trip, and it was his opinion that Newman had a Hispanic accent.

Newman filed a motion to suppress his identification in the photographic lineup and also filed a motion to suppress the jacket and tennis shoes.

At the suppression hearing, Newman and the State stipulated to the events following Newman's arrest. They also stipulated that it was the policy of the detention center to look through the suitcases for contraband, weapons, or explosives if they had not been searched by law enforcement officers prior to arriving at the detention center, but that no further inventory would be made before the suitcases were placed in the police property room. No warrant was sought or obtained to search the suitcases, and to Newman's knowledge, they were not opened or searched for inventory purposes. The district court overruled both of Newman's motions.

Although at trial the State did not offer the white tennis shoes into evidence, the black leather jacket was offered and received over Newman's objection. In addition, at trial, the victim identified Newman as her attacker and identified the leather jacket seized from Newman as being similar to the jacket her attacker was wearing the night of the assault.

Newman also filed a motion in limine to bar the prosecution from offering the testimony of Russell Grady and Julie Denny, on the ground that their testimony was more prejudicial than probative. The district court denied Newman's motion, and the testimony of both witnesses was admitted at trial over Newman's objections.

Grady testified that on March 22, 1993, at about 12:15 a.m., he was sitting in his automobile waiting to pick up a friend. Grady observed that a woman was being followed about a quarter of a block behind by a man Grady later identified as Newman. Grady stated that Newman was wearing a black leather jacket and white tennis shoes. Grady saw the

woman enter an apartment complex, after which Newman ran to the complex doors and looked in. Newman then walked back to the sidewalk and watched the building. When a light went on in an apartment in the right top corner of the building, Newman walked away.

Thinking Newman's behavior was unusual, Grady followed him and saw Newman walk to a building approximately two blocks from the victim's apartment. Grady drove around the block and continued to keep track of Newman. After approximately 45 minutes from the time he had initially seen Newman, Grady flagged down a patrol vehicle and reported what he had seen to the police. Grady also gave the police a description of Newman and then left.

After a couple of days, a detective visited Grady at work and asked him if he could pick out the man he saw from a set of photographs. Grady did not select any of the photographs shown to him. A few days later, Grady was shown a second set of photographs at his home. This time, Grady selected Newman's photograph and at trial identified Newman as the man he saw on March 22, 1993. Grady also identified the leather jacket seized from Newman's suitcase as similar to the jacket he saw Newman wearing that night.

Denny testified that she saw Newman on the night of March 22, 1993. Denny left work at approximately 10:15 p.m. and drove to her home approximately eight blocks from the victim's apartment. When Denny got to her residence, she thought she heard something dragging under her automobile, so she pulled into her apartment parking lot and looked to see if there was anything lodged underneath. When she stood up, there was a man behind her. He was wearing a black leather jacket and white tennis shoes. He asked Denny whether she knew a certain couple living in the building and then followed her to some stairs. Denny testified that the man also asked her if she was married or had a boyfriend. Denny continued walking and then went up the stairs to her apartment. The next evening, she reported her encounter with the man to the police.

Approximately 2 days later, Denny went to the police station and attempted to produce a composite drawing of the man

she saw. Several days after that, a police officer went to Denny's apartment and asked her if she could identify the man she saw from an array of photographs. Denny identified Newman in photograph No. 4 as that man. On cross-examination, Denny testified that the man who spoke to her that night did not have a Hispanic accent.

The prosecution also offered the testimony of Rev. Stewart Firnhaber. Firnhaber testified that he had met Newman in March 1993 when Newman went to Firnhaber's home for dinner. On that occasion, Newman was wearing a black leather jacket, a white shirt, and white tennis shoes. Firnhaber testified that Newman told him that he planned to travel by train to the west coast and then fly to the Philippines and on to Germany. Firnhaber testified that Newman did not have a Hispanic accent.

At the close of the prosecution's case in chief, Newman unsuccessfully moved for a directed verdict. He then attempted to introduce a voice exemplar by reading a "fairly neutral" statement to establish that he did not have a Hispanic accent. The State objected on the ground that the conditions under which Newman spoke to the victim could not be reproduced. The district court sustained the State's objection, ruling that Newman could "testify in any voice" he wished, provided that he did so under oath and subjected himself to cross-examination. Newman elected not to present any evidence.

## III. ANALYSIS

### 1. SUPPRESSION OF EVIDENCE

In the first assignment of error, Newman asserts that the district court wrongly failed to suppress the pretrial and in-court identifications of him, as they were tainted by impermissible suggestions, and that the district court wrongly overruled his motion to suppress the evidence seized from his suitcases.

### (a) Scope of Review

A trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Lopez*, 249 Neb. 634, 544 N.W.2d 845 (1996).

In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

### (b) Application of Law to Facts

#### *(i) Identification*

In urging in the first part of this assignment of error that the district court should have suppressed the identification testimony, Newman argues that the police employed unconstitutionally suggestive identification techniques. He maintains that the photographic array shown to the victim was impermissibly suggestive and that the police made statements to her which led her to pick his photograph. Newman argues that as a result, the district court should have suppressed not only the victim's pretrial identification, but her in-court identification as well.

Whether identification procedures in connection with photographic arrays were unduly suggestive and conducive to a substantial likelihood of irreparable mistaken identification is to be determined by a consideration of all the circumstances surrounding the procedures. See, *State v. Gibbs*, 238 Neb. 268, 470 N.W.2d 558 (1991); *State v. Price*, 229 Neb. 448, 427 Neb. 81 (1988).

Newman maintains that because his photograph was newer than the other photographs in the array, a subtle message was conveyed to the victim that he was the person who had most recently had contact with the law. Newman also maintains that out of the six photographs in the array, his was distinctive because it clearly portrayed him as the shortest and smallest of the men, a fact of no small significance in view of the victim's description of her attacker as a short man. In addition, Newman argues that the officer who showed the photographic array to the victim improperly influenced her because he told her that she did not "have to pick one out real fast." According to Newman, such a statement implied to the victim

that she did in fact have to pick one of the photographs from the array.

An examination of the photographic array fails to support Newman's contentions. There is no apparent difference in the age of the photographs in the array, and we are unable to discern the relative heights of the suspects depicted in the photographs. Nor was the officer's statement suggestive. We do not understand how any reasonable person would understand the statement, "Take your time. You don't have to pick one out real fast," to mean that a suspect had to be identified. The statement would be more reasonably understood to mean that one should take one's time in examining the photographs. The pretrial identification not being unduly suggestive and conducive to an irreparably mistaken identification, it could not have improperly tainted the victim's in-court identification of Newman.

### (ii) Seizure

In the second part of this assignment of error, Newman argues that the evidence seized from his suitcase was obtained in violation of U.S. Const. amend. IV and Neb. Const. art. I, § 7. Both the Fourth Amendment and article I, § 7, protect against unreasonable searches and seizures by the government. *State v. Neely*, 236 Neb. 527, 462 N.W.2d 105 (1990). Searches conducted pursuant to a warrant supported by probable cause are generally considered to be reasonable. *Id.* " '[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). These exceptions are " 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' " 403 U.S. at 455.

As no warrant was sought or obtained to search the contents of Newman's suitcases, the State has the burden of showing that the search falls within one of the established exceptions to the warrant requirement.

The State argues that the search was proper under the inventory exception and the "plain view" doctrine. According to the State, at the time Newman was processed into the detention center, he indicated that he had certain items of value in his suitcases which should be inventoried. Then, "[a]pparently, both as a result of Newman's statement, and as a result of their own policy to search the baggage for contraband, the luggage confiscated along with Newman was inventoried." Brief for appellee at 27. During the inventory search, the Nevada police discovered that the Lincoln police had requested the items and thus seized them as evidence. The State maintains that the seizure of the jacket and the shoes was permissible under the plain view doctrine because the police had a right to be in the suitcases as a result of the inventory search and because the items were in plain view with their incriminating nature immediately apparent due to the information from the Lincoln police.

The State's argument, however, is premised on a gross mischaracterization of the record. First, the record nowhere reflects that Newman told the authorities at the detention center that his suitcases contained items of value which should be inventoried. It is true that Newman listed his valuables on a form provided him, but he did not indicate that the three suitcases contained valuables which needed to be inventoried. The suitcases were merely listed on the form as bulk property. Second, although it was the policy of the detention center to conduct an inventory search of the suitcases for contraband, weapons, or explosives before placing them in the property room, that policy was not followed in this case. The suitcases were inventoried as bulk property and not opened before being stored in the property room. It was only after the Lincoln police told the Nevada police that certain items were needed as evidence that Newman's suitcases were opened and searched.

Thus, in turning our attention to the applicability of the inventory exception to the challenged search, we consider the evidence as it is, not as the State misstates it to be.

Both the U.S. Supreme Court and we have consistently held that inventory searches after an arrest are permissible. *Illinois*

*v. Lafayette*, 462 U.S. 640, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983); *State v. Filkin*, 242 Neb. 276, 494 N.W.2d 544 (1993); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992); *State v. Hill*, 214 Neb. 865, 336 N.W.2d 325 (1983). However, the propriety of an inventory search is judged by a standard of reasonableness, and such a search must be conducted in accordance with standard operating procedures. *Filkin, supra.* As we noted in *Filkin*, the reason for requiring standardized criteria or an established routine to regulate inventory searches is that

> "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime . . . .'"

*Id.* at 282, 494 N.W.2d at 549, citing *Florida v. Wells*, 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990).

The purpose of the inventory exception, therefore, is not to avoid the requirements of the Fourth Amendment, but, rather, to advance legitimate governmental interests which include (1) protecting the property of an arrestee in custody, (2) protecting the police from groundless claims that an arrestee's property has not been properly safeguarded, (3) protecting or maintaining the security of a detention facility by preventing the introduction of weapons or contraband into the facility, and (4) ascertaining or verifying an arrestee's identity. *State v. Dixon*, 237 Neb. 630, 467 N.W.2d 397 (1991).

The suitcase search conducted here was not a routine inventory search. The officers were clearly engaged in a purposeful search for incriminating evidence identified by the Lincoln police. Because the search does not fall within the boundaries of the inventory exception to the warrant requirement, the district court erred in denying Newman's motion to suppress.

However, not all trial errors, even those of constitutional magnitude, entitle an accused to a reversal of an adverse trial result; it is only prejudicial error, that is, error which cannot

be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside. *State v. White*, 249 Neb. 381, 543 N.W.2d 725 (1996); *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994); *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992).

Of those items that were unconstitutionally seized from Newman's suitcases, only the black leather jacket was admitted into evidence at trial. While the State would have been well advised to have left it out, the record reveals that this bit of physical evidence was cumulative. The victim gave a detailed description of her attacker which matched Newman's physical characteristics. She later identified Newman from a photograph in which Newman was not wearing a black leather jacket. Grady and Denny also gave detailed descriptions of Newman's physical characteristics and were able to identify him from a photograph in which he was not wearing a black leather jacket. In addition, all of these witnesses identified Newman at trial when he was not wearing a jacket. Thus, absent the jacket, the evidence that Newman perpetrated the crime was overwhelming. As a consequence, the erroneous receipt of the jacket into evidence was harmless beyond a reasonable doubt.

### (c) Resolution

For the foregoing reasons, the first assignment of error fails.

### 2. OTHER EVIDENTIAL RULINGS

In the second assignment of error, Newman challenges the district court's receipt of the testimony of witnesses Grady and Denny and its effective ruling that admitting the exemplar of Newman's voice would waive Newman's Fifth Amendment privilege against self-incrimination and subject him to cross-examination.

### (a) Scope of Review

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by those rules, not by judicial discretion, except in those instances in which the rules make judicial discretion a factor. *Floyd v. Worobec*,

248 Neb. 605, 537 N.W.2d 512 (1995); *State v. Carter*, 246
Neb. 953, 524 N.W.2d 763 (1994).

### (b) Applicability of Law to Facts

*(i) Testimony*

Newman first argues that Grady and Denny's testimony
should have been excluded because it was offered for an
improper purpose and not for one of the purposes listed in
Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404(2) (Reissue
1995), which provides:

> Evidence of other crimes, wrongs, or acts is not admis-
> sible to prove the character of a person in order to show
> that he or she acted in conformity therewith. It may, how-
> ever, be admissible for other purposes, such as proof of
> motive, opportunity, ·intent, preparation, plan, knowl-
> edge, identity, or absence of mistake or accident.

In addition, Newman argues that even if the evidence was
admissible under § 27-404(2), it was more prejudicial than
probative and thus should have been excluded under Neb.
Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995), which
reads, in relevant part: "Although relevant, evidence may be
excluded if its probative value is substantially outweighed by
the danger of unfair prejudice . . . ."

It has been firmly established that § 27-404(2) is a rule of
inclusion, rather than exclusion, and permits the use of rele-
vant bad acts for all purposes except to prove the character of
a person in order to prove that the person acted in conformity
with that character. *Carter, supra*; *State v. Wood*, 245 Neb.
63, 511 N.W.2d 90 (1994); *State v. Perrigo*, 244 Neb. 990, 510
N.W.2d 304 (1994); *State v. Martin*, 242 Neb. 116, 493
N.W.2d 191 (1992); *State v. Stephens*, 237 Neb. 551, 466
N.W.2d 781 (1991). The list of acceptable uses recited in the
statute is illustrative and not meant to be exclusive. *Carter,
supra*; *Perrigo, supra*. However, evidence which is otherwise
admissible under § 27-404(2) may be excluded under § 27-403
if its probative value is substantially outweighed by other con-
siderations. *Wood, supra*.

Therefore, we review the admission of evidence of other
acts under § 27-404(2) by considering (1) whether the evi-

dence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence outweighed its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the purpose for which it was admitted. *Carter, supra*; *Wood, supra*; *Martin, supra*.

It is within the discretion of a trial court to determine the admissibility of evidence of other wrongs or acts, and the trial court's decision will not be reversed absent an abuse of discretion. *Wood, supra*; *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993). An abuse of judicial discretion means that the reasons or rulings of a trial court are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *State v. Parmar*, 249 Neb. 462, 544 N.W.2d 102 (1996); *Carter, supra*; *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991).

With these standards in mind, we turn to consider whether Grady and Denny's testimony was properly admitted at trial.

We first consider the relevancy of the testimony. Relevant evidence means any evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995); *State v. Simants*, 248 Neb. 581, 537 N.W.2d 346 (1995).

The testimony was relevant because it placed Newman in the area where the sexual assault occurred near the time it occurred. That being so, we must next determine whether the testimony was admitted for a proper purpose. It is clear that the purpose of the testimony was to place Newman at the time and place of the crime. This is a permissible purpose under § 27-404(2) because the evidence tends to show that Newman had the opportunity to commit the crime in question. There is therefore no merit to Newman's contention that the testimony was admitted for an improper purpose.

The question thus becomes whether the testimony should have been excluded because it presented a danger of unfair prejudice. For the purposes of this rule, the probative value of evidence involves a measurement of the degree to which the

evidence persuades the trier of fact that the particular fact exists and the distance of the particular fact from the issues in the case. *State v. Eona*, 248 Neb. 318, 534 N.W.2d 323 (1995); *Perrigo, supra*. Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. *Eona, supra*; *Perrigo, supra*.

The testimony clearly had probative value. Grady's testimony placed Newman just a couple of blocks from the crime scene a few hours before the sexual assault occurred. Denny's testimony established that later on the same day as the sexual assault, Newman was approximately eight blocks from the victim's apartment. Any improper inferences that the jury might have drawn from the testimony of the two witnesses simply do not substantially outweigh the considerable probative value of their testimony. We also note that the district court gave a limiting instruction which admonished the jury that the testimony was to be received for the limited purpose of placing Newman in the area and no other.

Because the evidence admitted was relevant, had a proper purpose, had probative value outweighing its unfair prejudice, and was accompanied by a limiting instruction, the district court did not abuse its discretion in admitting the evidence at trial.

### (ii) Voice Exemplar

Newman next contends that the district court erred when it in effect held that he would waive his Fifth Amendment privilege against self-incrimination and be subject to cross-examination if he presented a voice exemplar to the jury. Newman maintains that the court's ruling denied him due process of law because he was effectively precluded from offering the voice exemplar in his defense.

It is well established that the Fifth Amendment privilege against self-incrimination protects only against compulsion to engage in testimonial self-incriminating activity. *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). Both state and federal courts have usually held that the privilege "offers no protection

against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Schmerber*, 384 U.S. at 764. See, also, *State v. Swayze*, 197 Neb. 149, 247 N.W.2d 440 (1976).

Thus, a defendant may be compelled to produce a voice exemplar because

> [t]he results of voice identification tests fall within the category of real or physical evidence. . . . In such a test, the speaker is asked, not to communicate ideas or knowledge of facts, but to engage in the physiological processes necessary to produce a series of articulated sounds, the verbal meanings of which are unimportant. The sounds alone are elicited for identification purposes through characteristics such as pitch, tone, intonation, accent, and word stress. The speech patterns of individuals are distinctive physical characteristics that serve to identify them just as do other physical characteristics such as color of eyes, hair, and skin, physical build and fingerprints.

*People v. Ellis*, 65 Cal. 2d 529, 533-34, 421 P.2d 393, 395, 55 Cal. Rptr. 385, 387 (1966). See, also, *Wade, supra* (compelling defendant to produce voice exemplar did not violate Fifth Amendment). The U.S. Supreme Court has also held that there is no constitutional bar to compelling a grand jury witness to read transcripts of intercepted conversations into a recording device. *United States v. Dionisio*, 410 U.S. 1, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973).

Newman urges that as the State could have compelled him to produce a voice exemplar without infringing on his Fifth Amendment privilege, due process principles of reciprocity demand that he be allowed to present a voice exemplar to the jury without waiving his privilege and becoming subject to cross-examination.

Other courts which have addressed this issue have held that due process reciprocity would allow an otherwise admissible voice exemplar to be introduced by a defendant without waiving his or her Fifth Amendment privilege against self-incrimination. *People v. Scarola*, 71 N.Y.2d 769, 525 N.E.2d 728,

530 N.Y.S.2d 83 (1988); *United States v. Esdaille*, 769 F.2d 104 (2d Cir. 1985), *cert. denied* 474 U.S. 923, 106 S. Ct. 258, 88 L. Ed. 2d 264. However, these courts have emphasized that the nontestimonial nature of a voice exemplar does not automatically require its admission into evidence. The defendant must still show that the voice exemplar is relevant and reliable.

We conclude that if relevant and reliable, a voice exemplar may be offered into evidence by a criminal defendant without waiving his or her Fifth Amendment privilege against self-incrimination.

Thus, the district court erred in effectively ruling that Newman's offer of a voice exemplar would waive his Fifth Amendment privilege and subject him to cross-examination. However, this does not necessarily mean that Newman was prejudiced by the district court's ruling, for the ruling may have been correct for other reasons.

The question is whether the voice exemplar was relevant and possessed sufficient reliability to be admitted. The central issue at trial was the identity of the perpetrator of the crime. The victim testified she thought that her attacker had a slight Hispanic accent. The other witnesses disagreed about whether Newman had an accent. The deputy sheriff who transported Newman back from Nevada testified that Newman spoke with an accent. But Denny and Firnhaber both testified that Newman did not speak with an accent. Thus, the presentation of a voice exemplar would have been relevant evidence going to the issue of identity.

That determination brings us to the question of the reliability of the proffered exemplar. For most exemplar or demonstrative evidence to be admissible, the proponent must show that the proffered evidence is reliable. In that regard, as other courts have noted, voice exemplar evidence by its very nature is different from other common types of exemplar or demonstrative evidence. *Scarola, supra*; *Esdaille, supra*. For example, the defendant in *People v. Shields*, 81 A.D.2d 870, 438 N.Y.S.2d 885 (1981), attempted to display a 14- to 16-inch scar on his abdominal region that the complaining witness, a rape victim, did not mention. Since the *Shields* defendant proffered hospital records showing that the scar had predated

the crime, there was no possibility of the scar's lack of authenticity. The same rationale has been applied to tattoos on a defendant's body. If a defendant can demonstrate that the tattoos predated the crime and that the crime victim would have had reason to notice the tattoos during the incident, it would be proper to permit the defendant to exhibit the tattoos to the jury without being subject to cross-examination. *Scarola, supra.*

In contrast, voice exemplar evidence is relatively easy to feign. An accent can be exaggerated or muted through a person's conscious efforts, such as avoiding particular words that one cannot pronounce without an accent. Since Newman made no offer to establish the genuineness of the exemplar, it would have been properly excluded as irrelevant. That is to say, in the words of the State's objection, the conditions under which Newman spoke to the victim could not be reproduced.

### (c) Resolution

Thus, the second assignment of error also fails.

### 3. SUFFICIENCY OF EVIDENCE

In the third and final assignment of error, Newman claims the district court mistakenly concluded that the evidence is sufficient to support his conviction.

### (a) Scope of Review

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact; a conviction will be affirmed in the absence of prejudicial error if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995); *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995). See, also, *State v. One 1985 Mercedes 190D Automobile*, 247 Neb. 335, 526 N.W.2d 657 (1995).

### (b) Application of Law to Facts

At the time in question, § 28-319(1) provided, in relevant part, that one "who subjects another person to sexual penetration and (a) overcomes the victim by force, threat of force, express or implied, coercion . . . is guilty of sexual assault in the first degree." Neb. Rev. Stat. § 28-318 (Reissue 1989) defined "sexual penetration" as including not only "sexual intercourse in its ordinary meaning," but "any intrusion, however slight, of any part of the actor's . . . body . . . into the genital . . . openings of the victim's body . . . . Sexual penetration shall not require emission of semen . . . ."

Thus, the State had the burden to prove beyond a reasonable doubt that at the time and place in question, Newman overcame the victim by force, or the express or implied threat thereof, and that he sexually penetrated her, no matter how slightly. See, *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994); *State v. Dondlinger*, 222 Neb. 741, 386 N.W.2d 866 (1986).

We have previously determined that except for the harmless erroneous admission of Newman's black leather jacket, the district court made proper evidential rulings. The properly admitted evidence detailed previously, viewed in the light most favorable to the State, amply supports findings that at the time and place in question, Newman overcame the victim by force and that he sexually penetrated her, if in no other way, by inserting one of his fingers into her vagina.

### (c) Resolution

Accordingly, the third and last assignment of error fails as well.

### IV. JUDGMENT

As first noted in part I, the judgment of the Court of Appeals is affirmed.

AFFIRMED.