IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. WYNNE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JARVIS L. WYNNE, APPELLANT.

Filed June 24, 2025.    Nos. A-24-595 through A-24-597.

Appeals from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

James K. McGough, of McGough Law P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

After separately assaulting three women, Jarvis L. Wynne was convicted of six charges in the district court for Douglas County. On appeal, he takes issue with the district court consolidating his three cases into one trial, denying his motions to continue, failing to adopt a proposed jury instruction, convicting him of two offenses without sufficient evidence, and ordering all his sentences to run consecutively. For the reasons that follow, we affirm.

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

On April 29, 2023, Allie Howard and her 6-year-old daughter were in the parking lot of their apartment complex. While Howard was getting something from her vehicle, she was attacked by a black man wearing a white T-shirt and cargo pants. This man approached Howard, wrapped his arms around her neck, and forced her to fall backwards on top of him into the vehicle. He then

- 1 -

held her in a headlock. For approximately 30 seconds, Howard struggled to breathe as she fought to free herself. Once she eventually got away and yelled at the man, he told her "Sorry, wrong person" and fled the scene. Howard's friend reported the incident to law enforcement who later came to take her statement.

The next day, Howard found a bag in her vehicle that was not hers. She also discovered a torn piece of white T-shirt and a hospital bracelet that had Wynne's full name and date of birth on it. She used this information to find a picture of Wynne online and recognized him as the man who attacked her. Later that day, she reported her findings to law enforcement and an officer came to collect the evidence. When the officer arrived, he showed Howard a picture of Wynne from the Omaha Police Department's database and she identified him as her attacker.

On May 1, 2023, Ruby Floerchinger was working at a tanning salon when a black man entered the store. She recognized him as someone who typically came in to get water or to use the bathroom. But when Floerchinger went into one of the tanning rooms to clean it, he followed her. Floerchinger's back was pressed against a tanning bed when the man put his hands on either side of her and grabbed the bed. The man then knelt and kissed her thigh twice. Floerchinger reported that she was too scared to move and did not feel like she was free to leave. After kissing her thigh, the man sat in a chair located in the corner of the room and motioned for Floerchinger to sit on his lap. She refused the invitation. The man then approached her again, got close enough to where they were touching, and whispered unintelligibly in her ear. Around 30 seconds later, a co-worker noticed what was happening, saw that Floerchinger looked scared, and told the man to leave. A little while later, Floerchinger reported the incident to law enforcement. When officers arrived, Wynne was already in custody from another incident. They showed Floerchinger a picture of him and she identified him as the man who assaulted her.

Wynne was already in police custody because he had attacked another young woman at a nearby gas station shortly after leaving the tanning salon. Adeline Morgenson was getting gas when a black man approached her, grabbed her from behind, put his hand over her mouth and nose, and forced her to fall backwards into her vehicle. With both her mouth and nose covered, Morgenson struggled to breathe as she fought her attacker. After approximately a minute, she wiggled free and fell to her knees outside her vehicle. By this time, the incident had garnered attention from other customers who came to Morgenson's aid. Wynne then fled the scene but was soon arrested by law enforcement. Following his arrest, law enforcement linked Wynne to the two prior incidents involving Howard and Floerchinger.

## 2. PRETRIAL PROCEEDINGS

On June 6, 2023, the State filed three separate informations against Wynne. Regarding the incident with Howard at her apartment complex, Wynne was charged with first degree false imprisonment, a Class IIIA felony; assault by strangulation or suffocation with a prior offense, a Class IIA felony; and of being a habitual criminal. For the incident involving Floerchinger at the tanning salon, he was charged with first degree false imprisonment, a Class IIIA felony; third degree sexual assault, a Class I misdemeanor; and of being a habitual criminal. And for the incident involving Morgenson at the gas station, he was charged with first degree false imprisonment, a Class IIIA felony; assault by strangulation or suffocation with a prior offense, a Class IIA felony; and of being a habitual criminal.

On December 4, 2023, the State filed a motion to consolidate Wynne's three cases because they were of a similar nature, happened in the same general area, and occurred within a 3-day timespan. On January 10, 2024, the district court granted the State's motion to consolidate.

A trial was scheduled for April 29, 2024. However, several days before it started, Wynne told his assigned counsel that he might proceed pro se. Nothing more came of this until the morning of the trial when Wynne refused to leave the jail. Wynne complained that the clothing provided by his attorney was too big and requested a change of clothes before going to court. But after his attorney provided him with different clothes, he still refused to wear them. Given Wynne's behavior that morning and throughout the last several weeks, his attorney requested a continuance so that a competency evaluation could be completed. He also requested the court inquire upon Wynne's competency once he appeared. The State objected to the continuance because it had flown in two witnesses, arranged for their hotel stays and transportation, and provided them with meal vouchers. In lieu of a continuance, the State recommended the court examine Wynne to determine if he was competent to proceed.

A few hours later, Wynne appeared in court and voiced his displeasure with his appointed attorney. He essentially complained about having three assigned attorneys since being charged and alleged that none of them had sufficiently communicated with him. More specifically, he asserted that his attorneys never informed him of the details of his case and therefore he knew nothing about what was happening, who was deposed, and who the witnesses and victims were. With these issues, Wynne told the court that he refused to go to trial with his current attorney.

Wynne's attorney responded to these allegations and informed the court that he had tried numerous times to update Wynne on his case. However, every time he met with him at the jail, Wynne would "shut down" after 10 minutes and refuse to speak with him. After being asked by the court, Wynne's attorney stated that he believed proper and sufficient discovery had been completed and that he was ready to proceed with the trial.

The district court noted that it had already appointed three different attorneys to represent Wynne, that Wynne's current attorney enjoyed "a fine reputation," and that his attorney had represented to the court that he had attempted to discuss the case with Wynne. Therefore, the court ruled that the trial would begin later that day. The court explained to Wynne that if he did not want to proceed with his current counsel, he would have to represent himself.

3. TRIAL

At trial, the State called 14 witnesses. The first several witnesses discussed the incident involving Howard.

During Howard's testimony she recounted the attack as previously described. She discussed how she was able to look up Wynne's name from the hospital bracelet she found in her vehicle and immediately recognized him as the man who had attacked her. She also explained how she identified him as her attacker using the photograph provided by the officer who came to collect the evidence. She then testified that Wynne was the person who had attacked her.

Officer Jordan Edwards of the Omaha Police Department testified that on April 29, 2023, he received a dispatch related to an assault. When he arrived at Howard's apartment complex, he noted that she appeared to be in shock, had a scratch on her face, and deep scratches on her lower back that were still bleeding. Edwards canvassed the area, interviewed several people, and

collected video recordings from nearby houses that depicted an individual matching Howard's description. Howard, and everyone who witnessed the incident described the attacker as a black male wearing a white T-shirt and dark colored cargo pants.

Jimmy Aguilar, a man who lives a couple houses away from where Howard was attacked, also testified. He reported that on April 29, 2023, a black man wearing a white T-shirt ran into his garage while he and his wife were in their vehicle. Aguilar stated that the man appeared agitated and was out of breath. He interacted with the man for about 15 minutes and gave him some water. Around an hour later, he spoke with an officer and gave him video footage from the cameras around his house, which was received into evidence. This footage shows a black man with a torn white T-shirt leaving Aguilar's residence.

Janet McLeaney also lives near where Howard was attacked. She remembered that on April 29, 2023, she heard a woman scream and saw a man running across the street. Her home surveillance system captured a video of this and was received into evidence. The video depicts what appears to be the same black man as Aguilar's video, wearing a torn white T-shirt and cargo pants, running away from the area.

Katharine Chandler is a friend of Howard's who was picking her up on April 29, 2023. As she was waiting in the parking lot, she was approached by a black man wearing a white T-shirt. She explained how she avoided talking with him because he was pretending like he was deaf so she would lower her window. When Howard came out of the apartment complex, Chandler said the man started to follow her. She stated that it looked like he was going to hit her when he put his arm around her, covered her mouth with his hand, and dragged her into her vehicle. Seeing this, Chandler called 9-1-1. Around a minute later, Howard was able to get free and started to yell at the man. In response, the man said, "Oh shit[,] Wrong Person" and ran away. Chandler was able to take several pictures of the man as he left, which were received into evidence. These pictures depict a black man in a white T-shirt walking away from her. Chandler then identified Wynne as the man who attacked Howard.

Floerchinger also testified and described her attack. Her testimony included quite a bit of back-and-forth regarding where exactly the man had kissed her thigh. Floerchinger initially testified that he kissed the "inside" of her thigh. In doing so, she stood up to show the jury where he kissed her and pointed to the "middle of the inseam of [her] jeans." During cross-examination, Wynne's attorney repeatedly asked Floerchinger if she was kissed on "the front" of her thigh and she responded affirmatively three times. But on redirect, the State asked her, "[J]ust to be clear, he kissed the inside of your thigh?" And she responded, "Yeah. I think it was just in that general area. . . . I wouldn't say it was, like, the inner area, but it was closer to inner than outer." Floerchinger said that she recognized the man who kissed her because he had come into the salon previously to use the bathroom. With this, she identified Wynne as the person who assaulted her.

Breanna Renault testified next. She was also working at the tanning salon when Floerchinger was confronted. She reported that while she was going upstairs, she saw a black man crouched down near the water fountain. She did not think anything of this because she had seen the man around five to ten times before. After being upstairs for around a minute, Renault realized that she forgot something downstairs. When she went back downstairs, she saw Floerchinger with a "total look of fear." At that point, she noticed the man was in the same room as her and touching her. Upon seeing this, Renault told the man he had to leave, which he did.

Renault also discussed how she gave law enforcement video footage from the tanning salon, which was received into evidence. These videos show a black man with a beard wearing a brown long-sleeved shirt and khaki-colored pants entering and leaving the salon. Renault testified that Wynne was the man from those videos and the person who assaulted Floerchinger.

Morgenson then testified. She described how she was restrained and not able to breathe because the man's hand was over her mouth and nose. She stated that she was scared during the incident and had very little freedom of movement throughout the attack. She explained that after the incident, she was in shock and did not wait for the police because she was unsure whether she wanted to report it. But after speaking with her mother and boyfriend, she decided to contact law enforcement. She then testified that Wynne was the person who attacked her.

Margaret Shearer was at the same gas station as Morgenson when she was attacked on May 1, 2023. She remembered hearing a loud scream and seeing something happening at one of the other pumps. She testified that she saw a black man wearing a brown shirt and khaki pants trying to push a girl into a car. Shearer immediately called 9-1-1 while her husband went to help. After her husband and some other men were able to get the man off Morgenson, the man ran across the street. She and her husband followed him while still on the phone with law enforcement. She directed officers to his location and watched them tackle and arrest him.

Officer Jordan Vander Zwaag of the Omaha Police Department testified next. He testified that on May 1, 2023, he received a dispatch for an assault in progress at a gas station. When he arrived on the scene, multiple people directed him to where the attacker had fled. After following those directions, he noticed a man matching the description of the individual he was looking for. He ended up chasing the man and was eventually able to apprehend him. While trying to put handcuffs on him, this man yelled out "Jarvis Wynne" and "12/23/82," which is Wynne's date of birth. He also repeatedly yelled, "Don't kill me," "Don't place things in me," and "Don't put things up my butt." Using a law enforcement database, Vander Zwaag was eventually able to confirm that this man was Wynne. An ambulance was called to medically clear Wynne and he was taken to UNMC for an evaluation.

Detective Thomas Ewin of the Omaha Police Department also testified. In April and May 2023, he was working in the Assault Unit and was assigned to investigate the three assaults. Ewin summarized the three investigations and explained how he linked them to Wynne. Essentially, Wynne's name was on the hospital bracelet found in Howard's car, he matched the descriptions given by Howard, Chandler, Floerchinger, Renault, and Morgenson, and he looked like the person depicted in the various video recordings. Moreover, Wynne was wearing the same clothing as the person who interacted with Floerchinger, had injuries consistent with Howard and Morgenson's accounts of fighting back, and was the person who was eventually apprehended after attacking Morgenson.

### 4. JURY INSTRUCTIONS

At the jury instruction conference, Wynne offered a proposed jury instruction that stated: "You must consider each of the alleged crimes separately. Evidence related to the elements of each of the separately charged offenses must only be considered solely for that individual offense and cannot be considered by you to support other offenses." Wynne argued that the proposed instruction was proper because the evidence of the separate incidents could not be used to infer

that he committed the other acts out of conformity or propensity. The State countered that the instruction might confuse the jury and preclude them from considering evidence from one offense that might pertain to another offense, without being used as propensity evidence. The district court overruled the proposed instruction.

### 5. VERDICT AND SENTENCING

In the case involving Howard, the jury found Wynne guilty of first degree false imprisonment, a Class IIIA felony, and assault by strangulation or suffocation, a Class IIA felony. Because the district court found that Wynne was a habitual criminal and was accordingly exposed to a term of imprisonment of 3 to 20 years for each felony, it sentenced him to 13 to 14 years' imprisonment for each conviction.

For the case involving Floerchinger, the jury found Wynne guilty of a lesser included offense of second degree false imprisonment, a Class I misdemeanor, and third degree sexual assault, a Class I misdemeanor. The court sentenced him to 364 to 365 days' imprisonment for each conviction and placed him on the Nebraska Sex Offender Registry for 15 years.

For the case involving Morgenson, the jury found Wynne guilty of first degree false imprisonment, a Class IIIA felony, and assault by strangulation or suffocation, a Class IIA felony. The court sentenced him to 13 to 14 years' imprisonment for each conviction.

The court ordered Wynne's sentences in each case to run consecutively to one another as well as run consecutively to the sentences imposed in the other two cases. As a result, Wynne received a total aggregate sentence of 54 to 58 years' imprisonment.

Wynne now appeals.

## III. ASSIGNMENTS OF ERROR

Restated and consolidated, Wynne assigns that the district court (1) erred in consolidating his charges across three cases into one trial, (2) abused its discretion by denying his motions to continue so that his competency could be evaluated and to give him time to secure new counsel, (3) erred in convicting him of second degree false imprisonment and third degree sexual assault when the State failed to adduce sufficient evidence to prove he committed the crimes beyond a reasonable doubt, (4) abused its discretion by failing to adopt his proposed jury instruction, and (5) abused its discretion by ordering his sentences to run consecutively.

## IV. STANDARD OF REVIEW

A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion. *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025).

A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Id.*

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh

the evidence; such matters are for the finder of fact. *State v. Kalita*, 317 Neb. 906, 12 N.W.3d 499 (2024). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Whether jury instructions given by a trial court are correct is a question of law. *State v. Gonzalez*, 313 Neb. 520, 985 N.W.2d 22 (2023). When reviewing questions of law, we resolve the questions independently of the lower court's conclusions. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Rezac, supra.*

## V. ANALYSIS

### 1. CONSOLIDATION OF TRIALS

Wynne first assigns that the district court erred in consolidating his charges across three cases into one trial. While he concedes the nature of the charges were similar enough to support joinder, he argues he was prejudiced by their consolidation because the jury heard evidence of all three crimes and may have relied upon propensity evidence in rendering its verdicts. He contends that if separate trials were held, evidence of the other crimes might not have been admissible under Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022) and therefore may not have been presented to the jury.

There is no constitutional right to a separate trial. *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023). Instead, the joinder or separation of charges for trial is governed by Neb. Rev. Stat. § 29-2002 (Reissue 2016), which states, in relevant part:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> (2) The court may order two or more indictments, informations, or complaints, or any combination thereof, to be tried together if the offenses could have been joined in a single indictment, information, or complaint or if the defendants, if there is more than one, are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. The procedure shall be the same as if the prosecution were under such single indictment, information, or complaint.
>
> (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.

Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2) whether the joinder was prejudicial to the defendant. *State v. Garcia, supra*. There is a strong presumption against severing properly joined counts. *Id.*

In *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014), the Nebraska Supreme Court articulated that a defendant does not suffer prejudice from consolidating multiple charges into one trial when the evidence supporting each charge was simple and distinct enough to where the jury could easily separate the charges and associated evidence. It noted that this was particularly true when the trial court also specifically instructs the jury to keep the charges separate and come to a separate decision regarding each charge. *Id.*

We determine the evidence for each charge was simple and distinct enough for the jury to easily separate the evidence as it related to each charge during deliberations. The evidence concerned three distinct incidents involving three separate victims at three different locations. While the attacks on Howard and Morgenson might have been similar in nature, they occurred three days apart in completely different venues. Howard was attacked in the parking lot of her apartment complex while Morgenson was attacked at a local gas station. And the incident involving Floerchinger was easily distinguishable as it did not involve the same degree of overt violence.

Moreover, the district court specifically instructed the jury to reach a separate decision with respect to each charge. In jury instruction No. 14, the court instructed the following: "Defendant Jarvis Wynne has been charged with six crimes. You must come to a separate decision regarding each crime." Beyond the general presumption that a jury follows the court's instructions, the record in this matter demonstrates that the jury abided by instruction No. 14. See *State v. Knutson, supra*. By finding that Wynne was guilty of the lesser included offense of second degree false imprisonment for his actions against Floerchinger—when he was found guilty of first degree false imprisonment in the other two cases—the jury demonstrated that it was able to distinguish between the different charges.

Therefore, we determine that Wynne is unable to demonstrate he was prejudiced by the district court consolidating his charges into one trial. Accordingly, we determine the district court did not abuse its discretion in granting the State's motion to consolidate.

2. MOTIONS TO CONTINUE

Wynne next assigns the district court abused its discretion by not granting his motions to continue. He asserts that his trial counsel moved to continue the trial for two reasons: (1) The delay in the proceedings would likely result in frustration from the waiting jury pool and (2) he believed that Wynne needed to be evaluated to determine if he was competent to stand trial.

We first address his claim that the motion to continue should have been granted due to the possibility that the delay in the proceedings caused the jury to become disgruntled. In *State v. Trail*, 312 Neb. 843, 890, 981 N.W.2d 269, 303 (2022), the Supreme Court provided:

> As a general matter, a defendant is not permitted to profit from the defendant's own bad conduct by disrupting courtroom proceedings and then urging disruption as a ground for mistrial. To hold otherwise would provide a criminal defendant with a convenient device for provoking a mistrial whenever he chose to do so, either inside or outside the courtroom.

(Internal quotation marks omitted.) We acknowledge that this proposition does not perfectly apply to the current situation as Wynne did not motion for a mistrial. However, we believe the principle is still applicable to the current matter. The delay that Wynne asserts might have disgruntled the

- 8 -

jury was caused by his own refusal to leave the jail. We do not believe that Wynne should benefit from a delay caused by his own actions. "To hold otherwise would provide a criminal defendant with a convenient device for" delaying their trial or other proceeding. *State v. Trail*, 312 Neb. at 890, 981 N.W.2d at 303. Therefore, because the delay in the proceeding can be directly attributed to Wynne, we determine the district court did not abuse its discretion in denying his motion to continue.

We next address Wynne's claim that the district court abused its discretion by not continuing the proceedings so that he could undergo a competency evaluation. While the standard of review does not change, we treat this assignment as Wynne taking issue with the court's decision to not order a competency evaluation or hold a competency hearing.

The question of competency to stand trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. *State v. Lang*, 305 Neb. 726, 942 N.W.2d 388 (2020). The trial court may cause such medical, psychiatric, or psychological examination of the accused to be made as it deems necessary. *Id.* But an explicit competency determination is necessary only when the court has reason to doubt the defendant's competence, and if proceedings do not provide the court with reason to doubt a defendant's competence, it does not err by not conducting a competency hearing. *Id.*

A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense. *Id.* We have recognized there are no fixed or immutable signs of incompetence, and a defendant can meet the modest aim of legal competency, despite paranoia, emotional disorders, unstable mental conditions, and suicidal tendencies. *Id.*

We determine the district court did not abuse its discretion in declining the request that Wynne undergo a competency evaluation before proceeding with his trial. When Wynne eventually appeared before the court, he demonstrated an ability to articulate his grievances and understand the proceedings against him. While ultimately unsuccessful, his complaints were rational and displayed an appreciation for the seriousness of his charges and a comprehension of his rights. Therefore, we determine the court's decision to not conduct a competency evaluation was not untenable or unreasonable.

### 3. SUFFICIENT EVIDENCE

Wynne next assigns that the district court erred in determining the State adduced sufficient evidence to convict him of second degree false imprisonment and third degree sexual assault beyond a reasonable doubt in the case involving Floerchinger.

On review of the sufficiency of evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Anderson*, 317 Neb. 435, 10 N.W.3d 334 (2024).

#### (a) Second Degree False Imprisonment

Wynne asserts there was not sufficient evidence to support his conviction for second degree false imprisonment because the State did not produce evidence that he restrained Floerchinger. He

contends that Floerchinger only testified that she did not feel free to leave, which did not satisfy the required element of the offense.

A defendant commits second degree false imprisonment when he knowingly restrains another person without legal authority. Neb. Rev. Stat. § 28-315 (Reissue 2016). Restrain means to restrict a person's movement in such a manner as to interfere substantially with their liberty by means of force, threat, or deception. Neb. Rev. Stat. § 28-312 (Reissue 2016).

When viewed in the light most favorable to the prosecution, we determine there was sufficient evidence for a rationale trier of fact to conclude that Wynne was guilty of second degree false imprisonment beyond a reasonable doubt. Floerchinger testified that Wynne followed her into a tanning room, stood between her and the door, and then positioned his arms on either side of her. With Floerchinger's back up against the tanning bed and Wynne's arms flanking her on both sides, her freedom of movement was substantially impacted. More so, while Wynne may not have made any overt threatening statements, a rationale trier of fact could have determined that his very presence and subsequent conduct was threatening. Floerchinger suddenly found herself alone in a small room with a strange man. This man almost immediately closed any distance between them, put his arms on either side of her, and began whispering in her ear. He then bent down to kiss her legs, which made Floerchinger too afraid to move. Given these circumstances, we determine that a rational trier of fact could have found that Wynne restricted Floerchinger's movement in such a manner as to interfere substantially with her liberty by means of a threat. Therefore, we determine there was sufficient evidence produced for the jury to find Wynne guilty of second degree false imprisonment.

(b) Third Degree Sexual Assault

Wynne next asserts there was not sufficient evidence to support his conviction for third degree sexual assault. He argues the State failed to present any evidence that he had contact with Floerchinger's intimate parts.

A defendant commits third degree sexual assault when he subjects another person to sexual contact without the consent of the victim. Neb. Rev. Stat. § 28-320 (Reissue 2016). Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Neb. Rev. Stat. § 28-318(5) (Cum. Supp. 2022). Sexual contact also includes the touching by the victim of the actor's sexual or intimate parts when the actor intentionally causes such touching. *Id.* Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. *Id.* Intimate parts mean the genital area, groin, inner thighs, buttocks, or breasts. § 28-318(2). The State need not prove sexual arousal or gratification, but only circumstances and conduct which could be construed as being for such a purpose. *State v. Osborne*, 20 Neb. App. 553, 826 N.W.2d 892 (2013).

Wynne asserts there was insufficient evidence to prove that he had sexual contact with Floerchinger because her testimony was inconsistent as to where exactly he kissed her thigh. On direct examination, she initially stated that he kissed her on the "inside" of her thigh. At that point, she stood up and pointed to the middle inseam of her jeans to indicate where he kissed her. However, on cross-examination, she testified that Wynne kissed "the front" of her thigh. And then on redirect, she indicated that he kissed that "general area," but that it was closer to her inner thigh

than her outer thigh. Despite these inconsistencies, there was clear testimony that Wynne kissed Floerchinger's inner thigh. Therefore, because we view the evidence in the light most favorable to the prosecution, we determine a rational trier of fact could have found that Wynne kissed Floerchinger's inner thigh. And because the circumstances of the offense clearly indicate that his conduct was for the purposes of sexual arousal or gratification, we determine there was sufficient evidence produced for the jury to conclude that he was guilty of third degree sexual assault beyond a reasonable doubt.

### 4. JURY INSTRUCTION

Wynne next assigns that the district court erred in not issuing his proposed jury instruction. The proposed instruction stated: "You must consider each of the alleged crimes separately. Evidence related to the elements of each of the separately charged offenses must only be considered solely for that individual offense and cannot be considered by you to support other offenses."

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Johnson*, 314 Neb. 20, 988 N.W.2d 159 (2023).

We determine the district court did not err by refusing Wynne's proposed jury instruction. While § 27-404(2) generally prevents the admission of other acts evidence for propensity purposes, it provides that evidence of other crimes, wrongs, or acts may be admissible for purposes other than propensity. See *State v. Wheeler*, 314 Neb. 282, 989 N.W.2d 728 (2023). In other words, § 27-404(2) allows the jury to properly consider evidence of a separate crime committed by a defendant for certain limited purposes. These other purposes include "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." § 27-404(2).

The Supreme Court has stated that "other acts evidence may have probative value as to identity where there are overwhelming similarities between the other crime and the charged offense or offenses, such that the crimes are so similar, unusual, and distinctive that the trial judge could reasonably find that they bear the same signature." *State v. Pullens*, 281 Neb. 828, 851-52, 800 N.W.2d 202, 223-24 (2011). An absolute identity in every detail cannot, however, be expected. *Id.* Where there are an overwhelming number of significant similarities, the evidence may be admitted, and any dissimilarities merely go to the weight of the evidence. *Id.* Evidence of other acts is also admissible to prove opportunity when it is offered to show that a defendant was in the area of the crime near the time it occurred. See *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996).

We determine the evidence related to each incident involving Howard, Floerchinger, and Morgenson would have been admissible in each case if separate trials had been held. Wynne's attacks on Howard and Morgenson shared enough of the same distinctive characteristics to prove identity. Both incidents involved women who were attacked randomly in public, drug backwards into their vehicle, and choked. And evidence of the incident involving Floerchinger was admissible to prove that Wynne had the opportunity to attack Morgenson. Floerchinger's testimony and the

salon's cameras placed a man who looked like Wynne and was wearing the same clothes as him in the area shortly before Morgenson was attacked.

Because Wynne's proposed instruction directed the jury to view the evidence for each allegation in complete isolation, it would have prevented the jury from considering the evidence for the purposes of identity and opportunity. Accordingly, the proposed jury instruction was not a correct statement of law. Therefore, we determine this assignment of error fails.

### 5. EXCESSIVE SENTENCE

Wynne next assigns that the district court abused its discretion by ordering all his sentences to run consecutively. Although he does not appear to challenge the consecutive sentencing across the three cases, he contends that the two convictions within both Howard and Morgenson's cases should have been ordered to run concurrently. He essentially argues that he could not have strangled either Howard or Morgenson without also falsely imprisoning them, so he should not be punished twice for each act.

In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *State v. King*, 316 Neb. 991, 7 N.W.3d 884 (2024). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.* It is not the function of an appellate court to conduct a de novo review of the record to determine whether a sentence is appropriate. *State v. Gibson*, 302 Neb. 833, 925 N.W.2d 678 (2019). It is within a trial court's discretion to impose consecutive rather than concurrent sentences for separate crimes. *State v. Geller*, 318 Neb. 441, 16 N.W.3d 365 (2025). This is true even when the crimes arise out of the same incident. *Id.*

We determine that the district court did not abuse its discretion in ordering all of Wynne's sentences to run consecutively. He essentially requests that we reevaluate the circumstances of his crimes and impose concurrent sentences because the imposition of consecutive sentences punishes him twice for the same conduct. But this ignores the fact that assault by strangulation and false imprisonment are separate crimes and that someone can falsely imprison another without strangling them. We are also mindful that it is not our function to conduct a de novo review of the record to determine what sentences we would have imposed or to reweigh the sentencing factors. See *State v. Gibson, supra*. See also *State v. Starks*, 308 Neb. 527, 955 N.W.2d 313 (2021). After a review of the record, there is nothing to indicate that the district court failed to consider any relevant factors or considered any impermissible ones. Therefore, given the serious and violent nature of Wynne's crimes, we cannot determine that the district court's decision to have all his sentences run consecutively was untenable or unreasonable. Accordingly, we determine the district court did not abuse its discretion in imposing consecutive sentences.

### VI. CONCLUSION

We determine the district court did not err in consolidating Wynne's charges into one trial and did not abuse its discretion by denying his motions to continue. We also determine there was

sufficient evidence presented for a rationale trier of fact to find him guilty beyond a reasonable doubt of second degree false imprisonment and third degree sexual assault. Lastly, we conclude the district court did not abuse its discretion by not adopting Wynne's proposed jury instruction or by ordering all his sentences to run consecutively.

AFFIRMED.